## In the United States Bankruptcy Court
## For the Eastern District of Pennsylvania

In re:                              : Chapter 11
                                    :
La Guardia Associates, L.P. and     : (JOINTLY ADMINISTERED)
Field Hotel Associates, L.P.        : Bankruptcy No. 04-34512 SR
                        Debtor(s)   : Bankruptcy No. 04-34514 SR
_____

# <u>Opinion</u>

By: Stephen Raslavich, United States Bankruptcy Judge.

## <u>Index</u>

| | | | |
|---|---|---|---|
| I. | <u>Introduction</u> | | Page 3 |
| II. | <u>Background</u> | | 6 |
| | A. | LGA | 6 |
| | B. | FHA | 9 |
| III. | <u>Discussion</u> | | 16 |
| | A. | LGA | 16 |
| | | 1. The value of the LaGuardia Crowne Plaza | 17 |
| | | 2. The HVS "as Encumbered" Appraisal | 21 |
| | | 3. The CBRE "Assumption of Debt" Appraisal | 23 |
| | | 4. The HVS & CBRE Conventional Financing Appraisals | 26 |
| | | a. The Need for Capital Expenditures | 27 |
| | | b. The Value of the OutParcel | 31 |
| | | c. The Remaining Differences in Value as Between HVS and CBRE | 35 |
| | | d. Sales Comparison Cross-Check | 42 |
| | | e. Summary | 44 |
| | B. | The LGA Plan of Reorganization | 46 |
| | | 1. Impaired Accepting Class | 48 |
| | | a. Class 9 | 49 |
| | | b. The Designation Motion | 57 |
| | | c. Class 10 | 74 |

        2.   Claims other than SunTrust              78

        3.   Claim of SunTrust                       79

    C.  Satisfaction of the Confirmation Requirements
        of §1129(a)                                  80

        1.   Feasiblity                              80
             a.   Effective Date Payments            83

                  (1)  Cash on Hand                  84
                  (2)  Sale of the Outparcel         85
                  (3)  Working Capital Loan          89
                  (4)  Sale of Rooftop Antenna
                       Rights                        91
                  (5)  Partner Contribution          91
                  (6)  Default Rate Interest
                       and attorneys fees            92
                       (a)  Default Rate Interest    92
                       (b)  Attorneys Fees           98

        2.   Feasibility of the LGA Plan Beyond
             its Effective Date                      100

             a.   Cramdown Interest Rate             102
             b.   The Tax Status of the LGA Bonds    112
             c.   Viability of the Crowne
                  Plaza's Operations Going Forward   119

                  (1)  The Nehmer Report             121
                  (2)  The Platinum Report           122
                  (3)  The AMEX Reports              124
                  (4)  The ESBA Report               125

    D.  Confirmation of the LGA Reorganization
        Plan Under §1129(b)                          128

    E.  Summary                                      136

IV. FHA                                              137

    A.  Approval of the FHA Disclosure Statement     137

        1.   Bifurcation of the SunTrust Claim       142
        2.   Conversion of the LGA Bonds             144

    B.  SunTrust's Stay Relief Motion                146

2

I.   **Introduction.**

The above two chapter 11 cases were filed in this District on October 29, 2004.  They are being jointly administered pursuant to an Order of this Court dated November 2, 2004.  The Debtors remain in possession of their assets and operate their respective businesses as Debtors in Possession.  The principal asset of each Debtor is a hotel.  Each hotel is located near one of the two major airports servicing the city of New York.[1]

There are at present four contested matters before the Court for disposition.  These are:

1)   A request for confirmation of the Third Amended Plan of Reorganization of Debtor, La Guardia Associates, L.P. (hereinafter "LGA");

2)   A request for approval of the Amended Disclosure Statement of Debtor, Field Hotel Associates L.P. (hereinafter "FHA");

3)   A request by SunTrust Bank, as Successor Indenture Trustee for a group of bondholders, (hereinafter "SunTrust" or "the Bondholders") under 11 U.S.C. §362, for relief from the automatic stay in each bankruptcy

---

[1] That being the case, it is unsurprising that motions were filed early in these proceedings requesting that venue of the cases be transferred to the Eastern District of New York.  Following a hearing, and for the reasons set forth in *In re LaGuardia Associates, L.P.*, 316 B.R. 832 (Bankr. E.D. Pa. 2004), these motions were denied.

case; and

4)    Requests by SunTrust, Brickman Airport Transportation,

L.L.C. (hereinafter "Brickman Transportation") and the

United States Trustee for an Order: 1) declaring

certain parties insiders of LGA; 2) designating their

accepting  votes in the LGA case as lacking good faith

under 11 U.S.C. §1126(e); 3) directing that their votes

not be counted for plan voting purposes; and 4)

equitably subordinating their claims to the claims of

all non-insider creditors of LGA.  (Hereinafter

collectively referred to as the "Designation Motion.")

All of the above matters have been vigorously litigated by

the parties thereto.  As well, the position of the Movants and

the Respondents in the pending matters have been vigorously

supported or opposed by certain other interested parties which

have actively participated throughout these lengthy proceedings.

Supporting all of the Debtors' positions is the Official

Committee of Unsecured Creditors.  (Hereinafter the "Committee")

Opposed to all of the Debtors' positions (and supportive of

SunTrust) are 1) the New York Hotel and Motel Trades Council,

AFL-CIO (hereinafter "the Union") and 2) the City of New York,

the New York City Industrial Development Agency, (hereinafter the

"IDA") and the New York City Economic Development Corporation

(collectively the "NYC Agencies").

4

The length of the hearings and the size of the combined evidentiary record amassed in connection with the pending matters is unsurpassed to the Court's recollection.  Apart from the voluminous pleadings, the hearings, which began on June 21, 2005, were held on 25 separate days, and did not finally conclude until July 24, 2006. The evidentiary record consists of well in excess of 3,000 transcript pages and approximately 200 exhibits.  The parties, in addition, have submitted roughly 350 pages of post hearing legal memoranda.  Measured end to end, the record spans several linear feet.

While daunting, the foregoing is nevertheless understandable, as the issues are complex, the stakes are high, and the relationships among the parties are particularly acrimonious.  The hearings, in large part, produced a combined evidentiary record.  As many of the issues attendant to the pending matters are, of course, discrete, the Court's opinion will address the contested issues separately and in detail.  By way of preview, however, and for the reasons hereinafter set forth, the Court holds that:

    1)    Confirmation of the LGA Plan, in its present form, will be denied, however exclusivity will remain in place and LGA will be afforded an opportunity to amend its plan in conformity with this opinion.  Pending the result of that, the SunTrust §362 Motion as to LGA will be

5

denied.

2)   The Designation Motion will be denied in its entirety.

3)   Approval of the FHA Amended Disclosure Statement will
be denied, the Debtor's exclusivity period will be
terminated, and the SunTrust stay relief Motion as to
FHA will be granted.

II.  **Background**.

A.   **LGA**

LGA is a New York limited partnership that operates a 358
room, 7 story hotel located at 104-04 Ditmars Blvd., East
Elmhurst, New York.  The property is in the Borough of Queens and
sits approximately one mile from the La Guardia Airport.  It is a
full service hotel, which is to say that, in addition to guest
rooms, the hotel has conference facilities, a lounge, a gift
shop, a swimming pool, and other amenities.  The hotel is
franchised and marketed as a Holiday Inn Crowne Plaza.  The
franchise agreement with Holiday Inn expires on December 28,
2010.

Martin W. Field is the president and sole shareholder of La
Guardia, Inc., a New York corporation, which is in turn the
general partner of LGA.  La Guardia, Inc. also owns a 5% limited
partnership interest in LGA.  Mr. Field individually, his wife
Kathleen P. Field, and certain Field family trusts own 91% of the
remaining limited partnership interests in LGA.  The residual 4%

6

is owned by others.  For all practical purposes, the affairs of LGA are, and have always been, controlled by Mr. Field.

Construction of the hotel was principally financed with the proceeds from $50,000,000 in bonds issued in 1985 by the IDA. (The "LGA Bonds") The hotel opened for business in October 1989. LGA operates the hotel as lessee pursuant to a ground lease (the "Lease") with the IDA which holds title to the hotel and the land on which it sits.[2]  The Crowne Plaza is managed by an entity called New Penn Management Company, Inc. (hereinafter "New Penn"), pursuant to a written management agreement which is terminable at will.  New Penn is wholly owned by Mr. Field, who is also its president and sole director.

In 1998, the LGA Bonds were refunded and the project was refinanced through another $50,000,000 bond issuance by the IDA. The LGA Bonds are collateralized, *inter alia*, by a first mortgage on the real property and its improvements, together with security interests in all personal property associated with the hotel and all revenues derived from the hotel's operations.[3]

_____

[2] Title would transfer to LGA for $1.00 upon redemption of the LGA Bonds.

[3] The Bondholder's security interest in LGA's accounts receivable is subordinate to a first lien which secures a working capital revolving credit facility.  The original working capital lender, Fleet Bank, assigned the loan and security to Brickman Airport Receivables Holdings, L.L.C. ("Brickman Airport Receivables"). $473,109.39 is alleged to have been owed on the line of credit as of the filing date, but the loan by this date is largely paid off.  As discussed, *infra*, LGA proposes to
(continued...)

There is also a mortgage on an adjacent parcel of land improved

with a parking garage(hereinafter the "Outparcel"). $8,710,000 of

the LGA bonds bear interest at the rate of 5.8% and mature on

November 1, 2013.  The remaining $41,290,000 bear interest at the

rate of 6% and mature on November 1, 2028.  The LGA Bonds, at the

time of their issuance, were triple tax exempt, which is to say

that the interest paid on them was not subject to federal, state,

or local income taxes.  There is a dispute among the parties as

to whether the LGA bonds retain that tax exempt status today.

According to Mr. Field, the Crowne Plaza performed well

between the years 1998 and 2000, but business suffered a swift

and devastating impact in the aftermath of the tragedy of

September 11, 2001.  By the spring of 2003, LGA was in default on

its bonds.  LGA at that point entered into a six month payment

forbearance agreement with the then holders of the bonds, and

agreed to have an examination of its books and records performed

by American Express Tax and Business Services, Inc. ("AMEX")

(AMEX ultimately produced two written reports more fully

discussed *infra*.)

At the time AMEX was retained, the LGA Bonds were held by

various large, publicly traded, high yield bond funds.  There

came a point in 2004, however, when the bonds changed hands,

---

[3](...continued)
replace the line of credit through a new lender.

apparently selling at a deep discount.  It would appear that at present all of the LGA bonds are owned by an entity known as JFK/LGA Brickman, L.L.C. (hereinafter "Brickman").

According to Mr. Field, efforts on his part to negotiate a forbearance agreement with Brickman were unsuccessful.  More to the point, on or about September 10, 2004, SunTrust commenced an action in New York state court against the IDA, LGA, Martin Field, and a plethora of Field related entities, seeking to foreclose on the hotel mortgage for the benefit of the Bondholders.  On October 4, 2004, SunTrust sought and obtained an *ex parte* Order in the state court foreclosure action appointing a receiver (the "Receiver") with broad authority to take control of the Crowne Plaza.  This event eventually precipitated the October 29, 2004 filing of the LGA bankruptcy case.

B.  **FHA**

The history of FHA bears a great many similarities to that of LGA.  FHA is a New York Limited Partnership that operates a 359, 12 story, full service hotel, located at 144-02 135th Ave, Jamaica, New York.  The property is in the Borough of Queens and sits approximately 2 miles from the JFK airport.  The hotel (hereinafter the "Holiday Inn"), is also managed by New Penn, and is operated under a franchise agreement with Holiday Inns, Inc. The JFK franchise agreement also expires on December 28, 2010.

Construction of the Holiday Inn, which opened in 1987, was

9

likewise principally financed through the IDA.  Specifically, and initially, via a 1985 $37,250,000.00 triple tax exempt bond issuance.  (The "JFK Bonds)[4]  As with LGA, the JFK Bonds were refunded and the project was refinanced in 1998. $6,475,000.00 of the JFK Bonds bear interest at the rate of 5.8% per annum and mature on November 1, 2013. $30,775,000.00 of the JFK Bonds bear interest at the rate of 6% per annum and mature on November 1, 2028.

Other than the fact that the general partner of FHA is a New York corporation known as Field Kennedy Associates, the ownership structure of FHA is identical to that of LGA.  Similarly, other than there being no adjacent parking garage at the JFK site, the collateral for the JFK Bonds is essentially the same as that for the LGA Bonds.  Beyond this, most all of the salient facts which precipitated the LGA bankruptcy filing hold true for FHA.  That is to say that: 1) economic performance of the Holiday Inn suffered after September 11, 2001; 2) following alleged events of default the JFK Bonds eventually changed hands at a discount and are now almost entirely owned by Brickman; and 3) the Receiver was also appointed in a mortgage foreclosure action instituted by SunTrust as to the Holiday Inn.  FHA filed its Chapter 11 case concurrently with LGA on October 29, 2004.

---

[4] The present tax status of the JFK bonds is also in dispute.

From the outset, the two chapter 11 cases have been
extremely contentious.  This stems, in part, from the fact that
the Bondholders do not accept either Debtor's explanation as to
the cause of its financial condition.  While conceding that the
events of September 11, 2001 negatively affected the hospitality
industry, the Bondholders insist that the main cause of both
Debtors' problems has been fraudulent conduct by the Debtors,
consisting of intentional self-dealing, breached fiduciary
duties, intermingling of funds, and overcompensating certain
entities, trusts, and/or individuals owned by and/or related to
Martin Field.

The Bondholders' contentions are based in the first instance
on the AMEX report of April 20, 2004, and a supplemental report
from AMEX dated June 17, 2005.  (Together the "AMEX Reports")
(See Exhibits M-51 & M-52)  The two lengthy AMEX Reports paint
distinctly unflattering portraits of the Debtors.  Of
significance, AMEX concludes 1) that for calendar years 2001
through 2004 the two hotels transferred funds to affiliated
parties, in excess of reimbursement for services received, in the
net amount of $3,943,443.00, and 2) that as of December 31, 2004,
the aggregate balance due the two hotels from affiliates was
$10,273,685.  (Ex M-51 at page 4) AMEX does not apportion fault
with specificity, but instead concludes that the impact of a
recession which began in early 2001 (exacerbated for the hotel

11

industry by the events of September 11, 2001) together with the
alleged misdeeds of management are to blame for the Debtors'
financial straits.

The Bondholders have not been as reticent in assigning
blame.  It appears to have been largely on the strength of the
first AMEX report that the Bondholders commenced foreclosure
proceedings and succeeded in securing the appointment of the
Receiver.  Further, a scant two days after the bankruptcy
filings, SunTrust and Brickman Airport Receivables moved for an
Order excusing the Receiver from compliance with 11 U.S.C.
§543(a) & (b) (in essence requesting that the Receiver be
permitted to continue his duties), or in the alternative for the
appointment of an examiner pursuant to 11 U.S.C. §1104.  The
foregoing motions were resolved consensually with the entry of an
Order on March 15, 2005, pursuant to which it was agreed that the
Committee would retain both a management and financial consulting
firm, and a separate hotel management consulting firm, each of
which was to then conduct an investigation and analysis of
various aspects of the Debtors' operations, much as an examiner
might do if one were appointed, and draw conclusions and make
such recommendations as might be appropriate.

In due course, Executive Sounding Board Associates, Inc.,
("ESBA") was retained as the financial and management consultant
and Platinum Hospitality Management, Inc. ("Platinum") was

12

retained as the hotel management consultant. Each firm prepared a written report detailing its work and its conclusions. (The Platinum report, dated June 9, 2005, is Exhibit M-1 and the ESBA report, dated June 16, 2005, is Exhibit M-2).

The Platinum and the ESBA reports are, generally, critical of each Debtor. ESBA, for example, acknowledges the events of September 11, 2001 as contributing to a downturn in business, but concludes that each Debtor could have avoided bankruptcy had it not been for inadequate management, inadequate capitalization, and improper diversion of funds. The Platinum Report, similarly, identifies, *inter alia*, flawed marketing strategies, unorthodox accounting practices, and the need for extensive renovations as factors which have and will continue to adversely impact the ability of each hotel to remain competitive in its market and improve profitability.

SunTrust sees the Platinum and ESBA reports as a validation of the earlier AMEX reports and a vindication of its positions on confirmation and stay relief.

The Debtors, of course, see matters quite differently. They contend that the hotels are being competently managed and dispute all accusations of fraud or misconduct. They further assert that the hotels have returned to profitability and are even with or outperforming their competitors. The Debtors are sharply critical of all of the reports, arguing as an initial matter that

13

both of the AMEX reports are expressly denoted as being
"tentative and preliminary drafts subject to change."  The
Debtors further note that the ESBA and Platinum reports make
several complimentary statements about each Debtor, but stress
that all of the reports nevertheless contain numerous
demonstrably blatant and material inaccuracies, which severely
undercut their reliability and any weight that should be placed
on negative opinions expressed therein.

The parties' early clash over the issues raised in the AMEX,
ESBA and Platinum reports set the stage on which the contentious
hearings commenced.  The Court will examine the parties'
conflicting accounts concerning the reports, but pauses to note
that the stark contrast between the parties' positions over the
reports illustrates, in part, why these proceedings have been so
protracted.  That is to say that, not only has most every
potential factual and legal dispute which could arise in the
context of these proceedings seemingly arisen, but that as to
each, the parties' positions have consistently fallen at polar
extremes.

Among the more prominent issues (including some raised in
the above reports) are:

A)   The value of each hotel.

B)   The physical condition and operational performance of
each hotel.

14

C)   The impact of existing labor unrest.

D)   The reliability of the Debtors' projections of future
     financial performance and the bearing thereof on the
     feasibility of the LGA Plan of Reorganization.

E)   An appropriate cramdown rate of interest.

F)   Artificial impairment and the existence of a true
     accepting impaired class of claimants in the LGA case.

G)   The present tax status of the LGA and FHA Bonds.

H)   Whether the absolute priority rule is violated in the
     proposed LGA reorganization plan.

I)   The Bondholders' entitlement to default rate interest.

J)   The existence of improper claims trading.


The above list is hardly exhaustive, but serves to make the
point.  Compounding matters has been the fact that the issues in
dispute are not just numerous, but, as noted, have also been
tenaciously litigated.  On this score, the Court appreciates the
civility and professionalism with which counsel for the parties
comported themselves throughout these fiercely contested
proceedings.  Yet, the Court is likewise constrained to register
disappointment that the parties themselves are so bitterly
opposed that a swift presentation of the case, let alone a
consensual resolution of their differences, appears never to have
been realistically within reach.

15

Courtesies in the courtroom aside, the depth of the parties'
animosity resonated repeatedly throughout the hearings, and is
reflected even more strongly in the parties post-hearing
submissions.  There, the gloves are off.  The Bondholders, more
specifically Brickman, is, per the Debtor, a vulture which bought
the respective IDA Bonds of each hotel for approximately 73 cents
on the dollar, and is at this point uninterested in any result
short of wresting ownership of the hotels from Martin Field, so
as to obtain a windfall profit from their resale in an
appreciating hotel market.  Mr. Field, on the other hand, is, in
the view of Brickman, a villain who has looted and mismanaged the
hotels for years and deserves now to lose them.  The parties'
antipathy for each other has obviously caused the rhetoric in
these proceedings to run high.  Still, it has not, as noted,
inhibited the development of an unusually large evidentiary
record upon which the Court can make requisite findings of fact
and conclusions of law, fortunately without the need, at this
juncture, to reconcile the parties' unfriendly views of each
other.  The Court will proceed in that fashion, addressing LGA
first, followed by FHA.

**III.  <u>Discussion</u>**.

    **A. <u>LGA</u>**

LGA has continued to operate the Crowne Plaza throughout
these proceedings pursuant to consensual cash collateral

16

agreements with SunTrust.  Typically, when a debtor and its
secured creditor hold opinions as to the value of the creditor's
collateral as dramatically divergent as those herein, the value
of the collateral will be determined early on in a case.  That
did not occur here and, in fact, to date there has been no
judicial determination of the value of either hotel.  The value
of the hotels obviously has overarching importance in each case.
The Court, accordingly, will begin its analysis with this key
issue.

### 1.   __The Value of the La Guardia Crowne Plaza__

The value of the hotel is certainly among if not **the** most
difficult question in this case to answer.  The parties have
collectively presented an enormous amount of evidence on this
point.  As with so many other issues, the experts are in sharp
disagreement.  This exacerbates matters, bearing in mind that the
appraisal of realty is, to begin with, an inexact science.
Ironically, one point on which every witness seemed to agree is
that the hotel industry, generally, has been in a sustained
period of significant appreciation, which is expected to
continue, and which is being driven by demand in the marketplace
for hotel assets.  This fact complicated matters herein, as it
tended to render the initial valuation evidence offered by the
parties in July 2005 outdated and less reliable as time passed.
For that reason, the parties presented additional updated

valuation evidence in June, 2006.  Further adding to the
complexity of the valuation question were 1) the appraiser's
disagreement over the relevance to valuation of the present tax
exempt debt structure due to the potential for assumption of the
existing debt by a buyer, and 2) the appraiser's disagreement
over the impact of the Outparcel.

Each party presented evidence from experienced, well
qualified experts.  The Debtor's chief appraiser was Daniel
Lesser, a highly credentialed appraiser, initially with the firm
of Cushman & Wakefield, and now the head of the hospitality
evaluation group at C.B. Richard Ellis, the world's largest real
estate services firm (hereinafter "CBRE") SunTrust's chief
appraiser was Ann Lloyd Jones, a senior vice president at HVS
International, a large international hotel consulting and
appraisal firm.

There are three widely acknowledged approaches to the
valuation of real estate.  As a threshold matter, the appraisers,
as might be expected, at least concurred on the most appropriate
methodology for valuing operating hotels.  Each endorsed and
employed the income capitalization approach.  Using this approach
the appraiser analyzes what is referred to in the industry as the
present worth of future benefits over an assumed holding period.
(Typically 10 years) The benefits consist of the net income over
the holding period and anticipated proceeds from a sale at the

18

end of the term.  Both appraisers agree that the income
capitalization approach is the preferred methodology for present
purposes, because it most closely reflects the investment
considerations of knowledgeable buyers.

An alternative to the income capitalization approach is the
sales comparison approach, which is a method of developing an
opinion of value in which a subject property is compared with
comparable properties that have recently been sold.  The sales
comparison approach is often employed, secondarily, as a cross
check to test the validity of the value of a property as derived
using the income capitalization approach.  A third methodology is
the replacement cost approach, an approach which is self-
explanatory, but which is rarely utilized in this setting.

While the value of the Crowne Plaza has yet to have been
determined by this Court, it can scarcely be said to have been an
unexamined issue.  Since its construction, there appear to have
been at least 9 separate appraisals of the facility, culminating
in the two most recent "updated" appraisals of HVS and CBRE.

CBRE places the "as is" value of the hotel, as of June 1,
2006, and assuming conventional market financing, at $56,200,000,
and values the Outparcel as of the same date at $5,300,000, for a
combined total value of $61,500,000.  The value of the Outparcel
assumes its eventual development as a hotel.  CBRE separately
valued the hotel and the Outparcel, in as is condition on June 1,

19

2006, but assuming a buyer's assumption of the existing bond debt
on a tax exempt basis, at $68,500,000.

HVS placed the "as is" value of the hotel on June 1, 2006,
assuming conventional market financing, at $43,000,000.  HVS did
not separately appraise the hotel on an assumption of debt basis,
as it asserts that even if that were possible, there is no
additional value associated with such a scenario.  HVS did
separately appraise the hotel on an assumption that in a sale the
hotel would be transferred subject to two encumbrances, 1) the
existing franchise agreement, and 2) the New Penn Management
contract.  On this basis, HVS values the hotel on June 1, 2006 at
$35,600,000.  HVS placed the "as is" value of the Outparcel on
June 1, 2006 at $3,300,000, also assuming its future development
as a hotel.  HVS maintains, however, that the Outparcel actually
has little or no independent value because if it is developed as
a hotel, replacement parking will be needed and the associated
costs thereof will exceed the value of the parcel.

The astonishingly large spread between the valuations
arrived at by such eminent professionals obviously suggests the
need to proceed with caution, which the Court has done, carefully
considering the two appraisers' assumptions and conclusions.
While the Court sees shortcomings in each set of appraisals, in
the end, the Court finds the CBRE valuation, assuming
conventional financing, to be the most accurate indicator of

value.

Before contrasting the CBRE and HVS appraisals which it
deems most relevant, the Court will explain first why it views
the alternative valuations proffered by the appraisers to be
unpersuasive.

### 2. **The HVS "As Encumbered" Appraisal.**

The Court assigns little weight to this valuation, which HVS
prepared at the request of SunTrust.  SunTrust argues that an "as
encumbered" valuation is appropriate because the LGA
reorganization plan contemplates the continued management of LGA
by New Penn and the continuation of the franchise agreement with
Holiday Inn.  What this ignores is the fact that the LGA
reorganization plan also contemplates retention of the hotel by
the Debtor.  In the scenario of a sale to a third party the
management and franchise agreements would not be true
encumbrances at all.

The management agreement is terminable at will and the
franchise agreement cannot be assigned without Holiday Inn's
consent.  In a sale of the hotel to a third party the property
could be transferred free of each.  SunTrust's hypothesis seems
to be that on a sale Mr. Field would nevertheless insist that New
Penn and the Holiday Inn flag be retained, and that the value of
the hotel would consequently be depressed.  Surely that vastly
understates the case.  In fact, in the opinion of this Court,

such a scenario is so unlikely to ever obtain that discussion of
it should not even be necessary.

In the first place, the Court views as utterly improbable
the notion that a prospective buyer would ever borrow and/or
invest tens of millions of dollars to buy a hotel that came
burdened with a management team other than one of its own
choosing.  Secondly, even assuming the validity of the HVS "as
encumbered" value, (which the Court does not) it is similarly
improbable that the Debtor would ever elect to receive $7,500,000
less upon the sale of the hotel in exchange for the privilege of
continuing to manage it.  That economic opportunity simply does
not equate.  Thirdly, HVS offers no explanation whatsoever as to
why the continued operation of the hotel as a Crowne Plaza, even
if that were an actual encumbrance, would of necessity negatively
affect value.  Finally, in dismissing this appraisal as
irrelevant, the Court notes that although HVS adhered to the
income capitalization approach in calculating its "as encumbered"
value, it did so utilizing a single overall capitalization rate
of 9%.  (See HVS updated appraisal – Table 16 at page 31) The
selection of the 9% rate appears arbitrary and, at a minimum, is
inadequately explained in the HVS appraisal.  (Indeed, in its
June 2005 appraisal, HVS states that the overall capitalization
method is not appropriate for the valuation of the subject
property.)  (See Exhibit M-5 at page 10-2) For all of the above

22

reasons, the Court, as noted, will disregard the "as encumbered" appraisal.

### 3.   The CBRE "Assumption of Debt" Appraisal

As noted, CBRE maintains that the value of the Crowne Plaza is enhanced by virtue of the ability of a potential buyer to assume the existing bond indebtedness on a tax free basis.  The reason offered is that the existing debt represents below market rate financing.  Whether either of these premises is correct is debatable.

Addressing the latter question first, the appraisers disagree over whether the terms of the existing indebtedness are superior to that which is available in the conventional financing marketplace today.  Ms. Lloyd Jones categorically believes it is not.  (N.T. 7/18/05 at page 178) Mr. Lesser sees it differently. Obviously, if assumption of the bond debt does not represent a bargain, then the issue of enhanced value is rendered moot.

There is little in the way of empirical evidence on point, as tax exempt financing for hotel projects is unusual. That said, the Court finds Ms. Lloyd Jones' analysis of whether assumption of the debt at the present time is advantageous to be the more persuasive.  Ms. Lloyd Jones contrasted acquisition of the hotel via assumption of the bond debt with an acquisition based on conventional financing at a 70% loan to value ratio, with an assumed interest rate of 6% and an equity investment of the

23

balance of the purchase price. (For discussion purposes she assumes the value of the hotel to be $50,000,000, roughly the same amount as the outstanding principal of the bonds) She notes, correctly, that because of the bond amortization schedule more money must be paid on the LGA Bonds in later years, making the effective debt service rate on the bonds from now to maturity higher than the coupon rate. (She estimates 7.87% based on a hypothetical value/sale at $50,000,000.) She points out, again correctly, that as a consequence the aggregate cost of borrowing to a purchaser would be significantly higher with assumption of the existing debt as opposed to conventional financing.

Ms. Lloyd Jones recognizes that her hypothetical entails a much larger equity investment by a buyer, but she maintains that, because the risk of having one's smaller equity investment "totally wiped out" is greater in the much more highly leveraged assumption of debt scenario which Mr. Lesser posits, most rational investors would still avoid it. The Court agrees.

In the Court's opinion, Mr. Lesser's assumption of debt valuation does not place sufficient weight on the foregoing factors. Further, the HVS position on this question is corroborated by other credible evidence in the record.

On this score, the Court notes and credits the testimony of Douglas Hercher, who is employed with the firm of Sonnenblick - Goldman Company and is an expert on the subject of financing

24

hotel transactions.  As an initial matter, Mr. Hercher noted that
for underwriting purposes lenders do not value hotel assets based
on the particulars of existing financing.  The reason for that is
because if there is a subsequent default, and the collateral must
be taken back, the lender will normally have to liquidate it
without regard to the details of the debt.  This makes sense.

More significantly, however, Mr. Hercher points out that
even if one assumes a higher net or "bottom line" cash flow due
to lower debt service, the property, with roughly $50,000,000 in
outstanding debt, would be quite highly leveraged, even at Mr.
Lesser's higher valuation.  As Mr. Hercher explains, the risk
which attends high leverage transactions (as likewise noted by
Ms. Lloyd Jones) causes investors to demand a greater return on
the equity component of the purchase price.  Put differently,
according to Mr. Hercher an investor in this setting would not
discount the net cash flow coming back to them at 18% or 19%, as
Mr. Lesser posited, and which might be typical in transactions
where the loan to value ratio was 65% or 70%.  Rather, the return
to equity demanded by an investor in this setting would be
greater.  The Court agrees. Mr. Hercher estimated that it could
be as high as 40%.  Even if that exaggerates matters, the
Debtors' financial projections do not reflect that, upon an
assumption of debt sale, a return to equity anywhere near a
satisfactory rate is possible.  As a consequence, a transaction

25

based on assumption of the existing debt, seems, as a practical matter, to be out of the question.  Perhaps this is why, notwithstanding Mr. Lesser's assumption of debt appraisal, the Debtor itself argues that Mr. Lesser's conventional financing appraisal is the most reasonable evidence of value in the record. (See May 17, 2006 post hearing memorandum of law of LaGuardia Associates, L.P., et al at page 52) As discussed, *infra*, the Court agrees.

The foregoing of course leaves aside entirely the first question posed above, i.e., whether the bonds retain their tax exempt status today and could be assumed on that basis by a buyer.  While the Court will discuss the status of the bonds *infra*, it need not belabor that issue here.  Instead, for the reasons already stated, the CBRE assumption of debt valuation will be disregarded.

### 4. The HVS and CBRE Conventional Financing Appraisals

Moving past the above, the Court turns its focus to the appraisals of most relevance, those being the respective June 1, 2006 valuations based on conventional market financing.  As previously noted, the difference between the two appraisers' valuations is striking.  It consists of three large, discrete components: first, HVS has deducted from its estimate of value $7,160,000, a sum it maintains must immediately be invested in the property by a buyer in the way of capital expenditures, and

which, in its opinion, any and every prospective buyer would thus
subtract from a purchase offer.  CBRE's appraisal contains no
similar reduction.  The second major area of difference involves
the Outparcel.  In its updated appraisal HVS nominally assigns a
value of $3,300,000 to the Outparcel, but makes clear that for
present purposes the Outparcel must be viewed as adding no value.
CBRE, by contrast, values the Outparcel, independently, at
$5,300,000.  The remaining difference  between the two appraisals
(approximately $6,000,000) results from a variety of divergent
assumptions as to the future economic performance of the Crowne
Plaza.  The Court will consider each of the three components in
turn.

### a. The Need for Capital Expenditures

The evidence offered on this issue is almost completely
irreconcilable.  As noted above, Ms. Lloyd Jones believes that a
prospective buyer of the Crowne Plaza would deduct $7,160,000
from any purchase offer based on an immediate need to invest that
amount in capital improvements to the hotel.  Mr. Lesser,
conversely, believes that, while the hotel could stand some
upgrading, it is in reasonable condition.[5]  More significantly,
however, Mr. Lesser maintains that in today's extremely strong
seller's market for hotel assets, a prospective buyer could not

---

[5]  Each side presented additional witnesses who corroborated the
respective appraisers assumptions as to the condition of the hotel.

take the position which Ms. Lloyd Jones espouses and hope to
acquire a target hotel.  The Court has carefully weighed the
evidence and concludes that, although Mr. Lesser's take on the
condition of the property may be somewhat rosy, his central
thesis is sound.  It is supported, moreover, by credible
corroborative testimony from Debtor's witness John Fox.[6]  The
Court finds the opinion espoused by Ms. Lloyd Jones on this issue
less persuasive, in part, due to its extremity, and in part due
to the fact that the supporting testimony as to the condition of
the hotel proffered from SunTrust witness Jonathan Nehmer
(discussed in more detail *infra*) was in many instances,
inconsistent, discredited and deserving of correspondingly less
weight.[7]

The parties' respective views of the condition of the Crowne
Plaza is one of the better examples of the polarization which
besets this case.  As is typical of such situations, precision
probably lies elsewhere.  SunTrust certainly offered credible
evidence that the hotel suffers from deferred maintenance and is

---

[6]   Mr. Fox is a senior vice president and shareholder of PKF
Consulting, a large international hotel consulting and appraisal firm.
He was qualified by the Court as an expert in the area of hotel
valuation.

[7] Mr. Nehmer is a licensed architect and the president of Jonathan
C. Nehmer & Associates, Inc.  He was qualified by the Court as an expert
in hotel capital expenditure planning, property condition assessment,
hotel design and renovation, and hotel brand compliance.

in need of various renovations, some of which are likely to be expensive.  Yet, the argument that virtually everything in the hotel "has to go" clearly overstates the case.  (N.T. 8/29/05 at 84-85, 90-91, 95)

The Court recognizes that LGA's characterization of the condition of the property similarly exaggerates matters, naturally in the opposite direction.  However, tilting matters somewhat in LGA's favor on this issue was an extensive set of recent photographs of the property offered into evidence. (Exhibit D-61) These do not bear out that the property is anywhere near as dilapidated as SunTrust would have the Court conclude.  Compounding the problem for SunTrust is the fact that its own experts disagreed over the extent of capital expenditures immediately required.  Ms. Lloyd Jones, for example, concluded that Mr. Nehmer's estimate was too high and lowered the number in her appraisal.  Ms. Lloyd Jones' own number, however, is not tied to anything in particular, and appears to be based on just her visceral feeling.

It would be a close call if determination of this question depended on the foregoing evidence alone.  However, it does not. In this regard, the Court credits the testimony of both Mr. Lesser and Mr. Fox with respect to the current state of the market and the behavior of its participants.  Each insists that investors do not typically take a capital expenditure deduction

in making a purchase offer, and certainly would not do so in a market such as the present one.[8]  As recalled, the strength of the hotel market is not in dispute.  Indeed, the head of HVS, Stephen Rushmore, is one of its leading proponents.

Mr. Rushmore, one of the most preeminent authorities on trends in the hospitality industry, has projected steep increases in the New York hotel market for the years 2004 forward. (Exhibit D-9) SunTrust is quick to rejoin that Mr. Rushmore's views speak to the industry generally, or where New York City is concerned, principally to the Manhattan market.  It is true that nowhere in his forecasts is Mr. Rushmore said to have focused on the value of any one particular hotel.  And the fact that performance and other issues specific to a particular hotel affect its specific value is a fair qualification to make. However, for present purposes, this qualification goes only so far.  For example, one reason offered for escalating New York City hotels values is the reduction in the number of available

---

[8]     Both Ms. Lloyd Jones and Mr. Lesser agreed that in today's market investors are looking for value enhancement opportunities; i.e., opportunities to reposition hotels in the market and generate added value.  Mr. Lesser adds, however, that in light of this, there could actually be fewer interested buyers for renovated hotels, because buyers would be expected to pay for the prior owner's renovations and could be precluded as a result from putting their own stamp or vision on an acquired hotel.  (N.T. 6/12/06 at 121, 138) This argument, to the Court, makes sense.

hotel rooms based on the conversion of hotels to condominiums.[9]
This is straightforward supply versus demand theory.  While
hotels in the La Guardia market are not reportedly being
converted to condominiums, an economic analogy still exists,
because for all practical purposes the La Guardia marketplace is
closed.  It is undisputed, in other words, that the only hotel
development opportunity which exists in the entire La Guardia
market lies with the Outparcel.  That being the case, it is
reasonable to expect strong demand for existing facilities within
the La Guardia market to persist and to drive prices upward, just
as Mr. Rushmore predicts.

For the foregoing reasons, the Court will not make a capital
expenditure reduction to the value of the Crowne Plaza.

### b.   The Value of the Outparcel

In the original appraisal it prepared, HVS did not assign
any separate value to the Outparcel.  In its updated appraisal,
HVS estimated the value of the Outparcel to be $3,300,000.
Nevertheless, and as previously noted, HVS strongly implies that
the Outparcel has no separate intrinsic value.  The Court finds
the HVS appraisal of the Outparcel to be internally inconsistent
and otherwise flawed.

LGA proposes to sell the Outparcel to a new, wholly owned

---

[9]  See, for example, Exhibit D-45.

subsidiary, and ultimately develop it as a 220 room Hampton Inn.
HVS' premise is that, if so developed, the existing parking
garage would most likely have to be demolished and replaced with
a new 300 space garage to be shared between the Crowne Plaza and
the Hampton Inn.  Relying on construction cost estimates supplied
by Mr. Nehmer, Ms. Lloyd Jones states that the new garage would
cost between $4,200,000 and $5,000,000, and that this alone
eliminates any separate value in the Outparcel.

Ms. Lloyd Jones also observes that all of this is before
taking into consideration any adverse impact which construction
of the new hotel would have on the Crowne Plaza.

The Court sees at least two serious problems with these
conclusions.  First, it would appear that the assumption of the
need for additional parking, let alone the need to construct a
new parking garage, is most likely incorrect.  It appears,
instead, that approval of a development plan for the proposed
Hampton Inn had already been secured by LGA from local
authorities, and that the construction permit did not require any
additional parking, only that the existing parking in place be
retained.[10]  As for the usage of the existing parking, Mr. Field
testified that a contract for 100 spaces in the existing garage

_____

[10]   The Court recognizes that the building permit has expired, but
Mr. Field testified that it could be renewed and there is nothing in the
record to suggest otherwise.

with Enterprise Rental Car has been discontinued, such that there
would be more than adequate parking for both facilities.  Not one
of these factors was taken into consideration by HVS and all are
unrebutted in the record.

Beyond this, the Court notes that demolition of the existing
parking garage and construction of a replacement garage are among
the two most significant dislocations which HVS states that it
focused on in assessing potential "adverse impact" to the Crowne
Plaza from development of the Hampton Inn.  The other, of course,
was construction of the new hotel itself.  As discussed above,
the parking issue, if it even is one, is clearly overstated.
Furthermore, while adjacent construction can, of course,
interfere with smooth business, it is a common hazard in urban
areas which can be prepared for and ameliorated.  It is
unreasonable to suggest that it would be catastrophic in a hotel
market whose entire competitive set is enjoying strong, sometimes
capacity occupancy levels.

Finally, the Court notes that although opining as to the
potential negative factors which development of the Hampton Inn
could conceivably occasion for the Crowne Plaza, (HVS updated
appraisal at Exhibit B - Page 9) HVS separately and
contradictorily states at the outset (HVS updated appraisal
Exhibit B - Page 2) that it did not take into consideration the
impact of the construction projection on the value of the

33

Outparcel.  This is a notable mis-statement, as HVS clearly did take such factors into consideration in ultimately determining to attribute no added value to LGA's ownership of the Outparcel.

Mr. Lesser valued the Outparcel at $4,000,000 as of June 1, 2005.  His methodology for arriving at that value is described at page 5 of his June 1, 2005 appraisal.  (Exhibit D-14) It involved use of a ground lease approach to appraising the value of the land alone, after taking into account the anticipated revenue stream from the new hotel.  This methodology appears to be sound and accepted in the industry, and it gains added reliability in this instance because the projected revenue stream of a new Hampton Inn is predicated, in part, on the results from an operating Hampton Inn, owned by Mr. Field, which sits adjacent to the JFK Holiday Inn.

The Court notes that Mr. Lesser valued the Outparcel at $5,300,000 on June 1, 2006.  This increase in value exceeds the increase in value he calculated over the same time frame for the Crowne Plaza Hotel.  (10% vs. 32.5%) This difference, of course, is significant and warrants scrutiny.  When questioned about it, Mr. Lesser pointed to certain specific factors.  First, he again placed emphasis on the fact that the Outparcel is the only remaining development opportunity in the La Guardia market; a factor which unquestionably enhances it value.  Second, there is the fact that hotel values are appreciating generally.  Finally,

34

he relied on statements by HVS president Stephen Rushmore that
New York City hotel values, in particular, are up 65% in the last
year.  Based on this, Mr. Lesser believes that his $5,300,000
valuation of the Outparcel may well be conservative.  The Court
need not reach that question.  Rather, given the deficiencies in
Ms. Lloyd Jones' appraisal of the Outparcel, and the legitimacy
of the assumptions made by Mr. Lesser, the Court concludes that
his valuation of the Outparcel is the more accurate.

       c.    **The Remaining Differences in Value as Between
HVS and CBRE.**

As noted, the balance of the difference between the two
appraisers' valuations of the Crowne Plaza is approximately
$6,000,000.  This would be a large difference, even standing
alone, and there are numerous explanations to account for it.

They relate to the projected profitability of the hotel and
include both income and expense side items.  The Court will
address some of the more significant areas of the appraisers'
disagreement.  It should be noted at the outset, however, that
this is the aspect of any appraisal of an operating business most
fraught with hazard.  That is because it is here more than
anyplace else that the appraiser goes furthest out on a limb,
looking into the future, endeavoring to assess risk, and
predicting how much money a business will take in versus what it
will spend.  It correspondingly is the part of an appraisal which
requires the greatest leap of faith on the part of a reader.

35

Surprisingly, insofar as certain of the metrics upon which a valuation derived from the income capitalization method is normally based, the appraisers' differences are relatively narrow. For example, as of June 1, 2006, Mr. Lesser utilizes a discount rate of 11% and a terminal capitalization rate of 8.5%. Ms. Lloyd Jones utilizes a discount rate of 11.1% and a terminal capitalization rate of 9%. Moving past this, Mr. Lesser projected a stabilized occupancy rate of 84% by 2008, whereas Ms. Lloyd Jones projects 83%, but not until 2009. While Mr. Lesser's forecasts in the foregoing respects are slightly more bullish than Ms. Lloyd Jones', in other respects they are less so. For example, Ms. Lloyd Jones projects a higher average room rate in years 2007 through 2009, and for all years post stabilization. The above differences, while narrow, nevertheless, account for some portion of the $6,000,000 difference between the two appraisals.

Also contributing, but once again in an unquantifiable amount, is the fact that, while ostensibly endorsing the traditional income capitalization approach to valuation (described at pages 16-17 *supra*), HVS did not, in fact, use it. Rather, it used a hybrid variant of its own development called the "simultaneous valuation formula." This method is described in the January 26, 2005 HVS appraisal at page 10-1. With this method the cash flow to equity and the equity reversion are

36

discounted to present value at an assumed equity yield rate, while the income to a mortgagee, based on the buyers' assumed borrowing, is separately discounted at an assumed mortgage interest rate.  The resultant values are combined for an estimate of aggregate value.  *Id.*

The Court recognizes that using this method HVS arrived at a higher valuation for the Crowne Plaza than it did using the traditional income capitalization calculus.  However, Mr. Fox in his evaluation of the HVS appraisal noted that the variety of assumptions utilized with the simultaneous valuation formula is such that if they are varied, even to a minor degree, the difference in valuation can be significant.  In this instance Mr. Fox opined that the use by HVS of a hypothetical 65% loan to value assumption was very conservative given the current market (Ex D-24 at page 4).  He also suggested that the assumption of a 19% equity yield rate requirement is high in today's market, whereas 15% is not uncommon.  *Id.*

While less confident as to Mr. Fox's assumed equity yield rate, the Court believes that the weight of the evidence supports Mr. Fox's contention that use of a higher loan to value ratio would have been appropriate in this matter.  The failure of HVS to have done so produced, in the opinion of the Court, an artificially low valuation of the hotel.

Beyond the foregoing, HVS, *inter alia*, placed greater

37

emphasis on the labor situation at the hotel.  The Court notes
that prior to the filing of the bankruptcy cases, the Union had
won elections to represent the employees at both the Crowne Plaza
and the Holiday Inn.  Events since then have been contentious.
There have been findings by the National Labor Relations Board of
unfair labor practices on the part of the Debtors, and a small
number of employees are on strike at each hotel.  There is also a
picket line at each site featuring a large inflatable rat.
Negotiations toward a contract have been ongoing during these
proceedings, but are unresolved to date.[11]

By way of a generalized summary of the situation, the Union
claims that its goal is to have the Debtors enter into contracts
which will phase in "industry standard" wage rates and benefits
over time.  The Debtors maintain that the existing impasse with
the Union is due to the Union's improper insistence that
Manhattan wage rates and benefits be used as the benchmark, when
the hotels are located in Queens where labor costs are
traditionally less.

Although there are no unpaid wage claims in this case, the
Union, as noted, has participated in these proceedings, appearing
always as a vigorous supporter of SunTrust. It seems abundantly
clear that the Union's stance in this case is predicated on the

---

[11] NLRB proceedings are not subject to the automatic bankruptcy stay.

simple assumption that it will gain leverage by opposing the
Debtors and/or that it will have more success in procuring a
favorable contract for its membership with SunTrust.

While sensitive to the Union's concerns, the Court is
constrained to observe that the Union's input in these
proceedings has not been particularly helpful.  The Union's
single issue agenda is fairly transparent, and the sometimes
shrill tenor of its opposition significantly diminishes the force
of its arguments as to the matters pending before the Court,
which arguments, in the main, are in reality little more than a
repetition of SunTrust's arguments.  Of course, this does not
make the labor issue irrelevant.

The labor issue independently figures into the valuation
equation.  Ms. Lloyd Jones, for example, believes that in the
short run strikers are bad for business, and that in the long run
higher labor costs are inevitable.  Each factor, she believes,
adversely affects profitability.  SunTrust, for its part, argues,
furthermore, that Mr. Lesser "failed to take into account the
Union difficulties as an additional future cost." (SunTrust Post
Trial Memorandum of Law at Page 17) The Court finds this latter
assertion, in particular, to be incorrect.

Certainly, a strike is rarely, if ever, good for business.
However, the Debtors offered photographs depicting the strikers
and the location of the picket line in relation to the hotel

entrances.  It did not appear from these photographs that the
picketing actually interferes to any material degree with hotel
operations at either site, and there was no evidence to the
contrary.  Furthermore, Mr. Lesser demonstrated a particularly
keen awareness of current labor/management issues in the
hospitality industry.  (N.T. 9/19/05 at 53) He acknowledged, in
particular, that costs are going up and will continue to do so,
but he concluded that decreased profitability is not inevitable
in every case, because staffing and other changes can be
implemented to improve efficiencies and offset the impact of
higher marginal costs.  As a consequence, he did not consider the
existing labor strike to be a factor that would have a major
adverse affect on value in today's strong market.  The Court
finds this logic persuasive.

Another prospective expense side item over which the
appraisers disagreed, and which contributed to their differing
valuations, is repairs and maintenance.  As already discussed,
HVS and Mr. Nehmer believe that virtually the entire hotel needs
to be gutted and totally retrofitted.  Assuming it is not, then
HVS posits that property repair and maintenance expenses must of
necessity consume a larger percentage of revenues, a factor which
will again hurt profitability.  This notwithstanding, in her
appraisal, Ms. Lloyd Jones actually projects only slightly higher
POM (property operations and maintenance) expenses than Mr.

Lesser.  The reason for this is that Ms. Lloyd Jones' valuation
of $43,000,000 assumes that $7,400,000 in capital expenditures
will immediately be made by a new buyer, thereby resulting in
maintenance expenses going forward which are not all that much
higher than those projected by Mr. Lesser.  While not an enormous
component, a portion of the $6,000,000 difference, nevertheless
lies here.  Although rejecting her position on a capital expense
deduction, the Court believes that Ms. Lloyd Jones' repair and
maintenance expense projections are the more realistic.

The foregoing points are by no means the only ones over
which the appraisers disagreed.  In sum, it is fair to say that
Ms. Lloyd Jones views the future of the Crowne Plaza as being
much riskier than Mr. Lesser.  Consequently, she predicts lower
profitability, particularly in the near term.

It is exceedingly difficult to reconcile the appraisers'
numerous individual disagreements on this score, because for the
most part that simply devolves into second guessing their
assumptions.  Beyond the observations made above, the Court will
eschew that.  However, the Court does conclude that overall Mr.
Lesser's forecasts warrant greater weight 1) because his
methodology was more in the mainstream than Ms. Lloyd Jones'
somewhat unorthodox "simultaneous valuation formula," and 2)
because in a plethora of areas, most notably capital expenditures
and the Outparcel, the Court found the positions adopted by HVS

to be lacking in objectivity.

The Court accordingly will not reduce the value of the Crowne Plaza by the $6,000,000 discussed herein.  The Court finds support for this conclusion in the comparable sales cross-check.

### d.   Sales Comparison Cross Check

As noted above, hotel appraisers typically utilize the sales comparison approach as a means by which to cross check valuations derived using the income capitalization method.  As with almost every other issue, the parties clashed here as well, disputing the legitimacy of those recent sales of hotels alleged by the other side to be comparable to the Crowne Plaza.

On this score, LGA offered evidence that it had received a letter from an entity known as the Carlson Group in which the latter offered to buy the Hotel for $45,500,000.  LGA infers that the Crowne Plaza must be worth much more than this since the offer was unsolicited and "an opening bid."  LGA also presented evidence that the Hyatt Hotel at Dulles Airport sold in September, 2005 for $72,500,000.  LGA argues that there are many similarities between the Crowne Plaza and the Hyatt which make the latter a particularly good comparable sale to consider.

It would appear that there are indeed numerous similarities between the Dulles Hyatt and the Crowne Plaza.  Moreover, some of the differences (e.g., more rooms at the Crowne Plaza; longer distance of the Hyatt to downtown Washington D.C. versus distance

42

of the Crowne Plaza to downtown Manhattan) favor the Crowne
Plaza.  Yet, the Court is inclined to agree with SunTrust that it
can be risky to rely on the terms of any one single transaction
for these purposes.  On this score, SunTrust notes, for example,
that an online article describing the Hyatt sale indicated that
the sale was immediately preceded by a $5,000,000 room
renovation.  It is precisely for this reason that broader
regional sales trends are often more reliable.  Where this is
concerned, however, LGA presented evidence with more
persuasiveness.

     LGA's witness John Fox explained that there are three ways
of utilizing comparable sales in valuation analysis, 1) dollar
price per room, 2) a room revenue multiplier, and 3) an overall
capitalization rate.  (N.T. 9/20/05 at 32) The dollar price per
room looks at the total sales price divided by the number of
available rooms.  The room revenue multiplier approach divides
the sale price by gross room revenue.  Finally, with the overall
capitalization method, the sales price is divided by the earnings
of the hotel.

     In his report, (Exhibit M-24) Mr. Fox noted that, in the HVS
report, HVS itself had analyzed a series of recent suburban New
York City hotels sales from 2002 to the mid 2004.  The average
values generated utilizing the above three indices, and applying
them to the suburban sales HVS analyzed, produced a value for the

43

Crowne Plaza of $53,400,000.  Yet, HVS ultimately placed the

value of the Crowne Plaza many millions of dollars below that.

There is insufficient explanation in the HVS report to

account for this anomaly.  Moreover, the value based on

comparable suburban sales was before taking into account the fact

that the suburban sales are all two years or older.  Mr. Lesser

also noted and emphasized this.  He stated that the HVS valuation

of the Crowne Plaza, at $119,000 per room, is "below the low end

of reasonableness."  The specific comparable sales Ms. Lloyd

Jones utilized in her updated appraisal, and which resulted in a

$119,000 per room calculation, are set forth on Table 17 thereof

(HVS updated appraisal - Exhibit B at page 32) Extrapolating the

suburban sales discussed by Mr. Fox and/or the comparable sales

in the HVS updated appraisal, discussed by Mr. Lesser, by the

projected increase in New York City hotel values estimated by Mr.

Rushmore, would clearly indicate a much higher value for the

Crowne Plaza.[12]  In the opinion of the Court the HVS sales

comparison valuation does not dovetail with its income

capitalization valuation.  In fact, it seems severely askew, once

again suggesting that the latter valuation is understated.

### e.  **Summary**

As discussed, the Court finds neither of the main appraisals

---

[12] HVS notes that there is a high degree of interdependency between
the LGA and Manhattan markets.

to be free from criticism.  However, the difference of almost $20,000,000 in the valuations as determined by two seasoned professionals borders on the absurd.

Having carefully weighed the evidence, the Court, as noted, finds Mr. Lesser's June 1, 2006 conventional financing appraisal to be the most reliable.  The reasons, to recapitulate, are:

> 1)   The Court rejects the HVS opinion that an immediate $7,160,000 capital expense reduction must be taken
>
> 2)   The Court rejects the HVS opinion that the Outparcel has no value, and accepts Mr. Lesser's opinion that it has _at_ _least_ a value of $5,300,000, and
>
> 3)   The Court finds the CBRE assumptions which factor into the remaining difference of approximately $6,000,000 to be, in the aggregate, more reasonable than those of HVS.
>
> 4)   A sales comparison cross check better supports the valuation of CBRE.

Beyond the above, the Court notes, in conclusion and with some distress, that the suggestion was made during these proceedings that HVS president Stephen Rushmore holds a significant interest in an entity known as HEI Hospitality, Inc. ("HEI") HEI has at some point apparently had discussions with the

Debtors about acquiring both of the hotels at issue herein.  This fact only came forward on voir dire examination of Ms. Lloyd Jones.  No rebuttal of these contentions was offered to the Court, nor was any disclosure of these facts made in any of the HVS appraisals.  The Court is of the opinion that the serious allegations of a conflict of interest on the part of HVS mandated a response if the facts were misrepresented.  If the facts alleged are accurate, then the Court is of the opinion that disclosure of the same should absolutely have been made by HVS and/or SunTrust during these proceedings.  Their respective failures in this regard cast serious doubt on the independence of the value of the Crowne Plaza they together have advocated.[13]

For all of the foregoing reasons the Court finds the value of the Crowne Plaza as of this date to be no less than $61,500,000.

**B.   The LGA Plan of Reorganization**

The LGA Reorganization Plan, as noted, contemplates the Debtor's retention and continued operation of the Crowne Plaza

---

[13]   The Court recognizes that Ms. Lloyd Jones professed to have only a vague awareness of these facts. However, she cannot distance her firm from the situation. The HVS appraisals bear the signature of Mr. Rushmore, in addition to that of Ms. Lloyd Jones.  In the opinion of the Court, the failure of HVS to have disclosed these facts is, at best, an atrocious lapse in judgement. Had HVS been an estate retained professional, for example, the Court has little doubt that HVS' failure to disclose that it was rendering a valuation opinion, for opponents of the Debtor, when the principal of the Company had previously been in negotiations to buy the asset in question, would warrant denial of compensation.

Hotel.  There are 14 separate classes of claims and interests

identified in Article 2 of the Plan, although it will not be

necessary to discuss all of them herein.  Confirmation of the

Plan is sought under the provisions of 11 U.S.C. §1129(b),

sometimes referred to as the Bankruptcy Code's "cramdown"

provision.  Resort to §1129(b) may be had if a Plan meets all of

the other confirmation requirements found in §1129(a), with the

exception of §1129(a)(8), (non-impairment of, or acceptance of

the Plan by, each class of claims or interests).  These are:

> (1) the plan's compliance with title 11, (2) the
> proponent's compliance with title 11, (3) the
> good faith proposal of the plan, (4) the
> disclosure of payments, (5) the identification of
> management, (6) the regulatory approval of rate
> changes, if applicable, (7) the "best interest"
> test (i.e., each claim holder in an impaired
> class has accepted the plan or will receive no
> less than would be received in a Chapter 7
> liquidation), (9) treatment of administrative and
> priority claims in accordance with §1129(a)(9),
> (10) acceptance by at least one impaired class of
> claimants, (11) the feasibility of the plan
> (i.e., confirmation of the plan is not likely to
> be followed by liquidation or further
> reorganization except as contemplated in the
> plan), (12) the payment of bankruptcy fees, and
> (13) the payment of retiree benefits.

*See* 11 U.S.C. §1129(a).

Of importance, where the requirements of §1129(a)(8) are

unmet, resort to the cramdown provisions of §1129(b) can be had

only if at least one impaired class of claims has accepted the

plan, without considering the votes of insiders.  *See* 11 U.S.C.

§1129(a)(10).  If a class is unimpaired, it is conclusively

47

deemed to have accepted the plan. *See* 11 U.S.C. §1129(a)(8)(B).
Correspondingly, if a class is to receive nothing under a plan,
its non-acceptance is conclusively presumed.

Before turning to a fuller description and consideration of
the Plan, the Court will first address a threshold objection
interposed by SunTrust; to wit: that the Plan before the Court is
unconfirmable under §1129(b), because there is no impaired
accepting class of claims.

### 1.   **Impaired Accepting Class**

The LGA Plan consists of 8 classes of claims which are
alleged to be impaired, as follows:

> Class 2 - priority claims held by the New
> York City Department of Finance and New York State
> Department of Taxation in the approximate aggregate
> amount of $200,000;

> Class 3 - secured tax claims (of which there
> are none);

> Class 4 - SunTrust's secured claim;

> Class 6 - secured lease claim in the amount
> of $41,029.57 originally held by Sovereign Bank and now
> held by Brickman Airport Transportation;

> Class 7 - secured lease claim in the amount
> of $5,744.70, originally held by CitiCapital and now
> held by Brickman Airport Transportation;

> Class 8 - the scheduled claim of Joseph Selig
> in the amount of $10,139,365.36;

> Class 9 - general unsecured creditor claims
> in the approximate amount of $783,000.00.

> Class 10 - the claims of Holiday Hospitality
> Franchising, Inc.

48

Of the above, six classes are acknowledged to have rejected the Plan and two are alleged by LGA to have accepted the Plan. SunTrust disputes the legitimacy of the alleged accepting impaired class votes for purposes of compliance with §1129(a)(10).

LGA's Report of Plan Voting reflects acceptance by Class 9 (general unsecured creditors) and Class 10 (Holiday Hospitality Franchising Inc., - unpaid pre-petition license agreement fees). SunTrust argues that the Class 9 vote may not be counted for two reasons. First, SunTrust argues that once the Court values the Crowne Plaza, SunTrust will be shown to be undersecured and the holder of a large deficiency claim which must be included in Class 9. SunTrust says that its negative vote in Class 9 will cause the class to reject the Plan. Second, SunTrust argues that should the Court find that SunTrust has no deficiency claim, because it is oversecured, the Class 9 vote may nevertheless not be counted because the class is "artificially" impaired. As to Class 10, SunTrust argues that its vote may not be counted because the Class is not even entitled to vote. The Court will examine each of these contentions.

### a.   Class 9

SunTrust's first argument can be disposed of quickly. As of this date, SunTrust's claim (No. 128) is filed in the amount of $54,076,220.17. As of the same date, the Court has now found the

49

aggregate value of the Crowne Plaza to be not less than
$61,500,000.  SunTrust, accordingly, is oversecured by several
million dollars, before consideration of any other collateral.
SunTrust thus holds no deficiency claim includible in Class 9.

SunTrust's second contention (Artificial Impairment)
presents a closer call, but likewise fails.  The treatment
proposed for the general unsecured creditor class under the
Debtor's plan can be summarized, as follows: Unless they elect an
alternative all cash option of 90% payment on the effective date,
general unsecured creditors are to be paid 75% of their allowed
claims on the effective date of the Plan, with the balance to be
paid, with interest at 6% per annum, one year thereafter.

In the first instance, it is clear that claims in Class 9
are impaired.  A claim is unimpaired if the plan "leaves
unaltered the legal, equitable and contractual rights to which
such claim or interest entitles the holder of such claim or
interest."  11 U.S.C. §1124(1).  As the Class 9 claimants are
entitled to be paid their allowed claims in full upon the
effective date, the treatment imposed by the Debtor impairs the
class.

Relying on the decision of the Third Circuit Court of
Appeals in *In re Combustion Engineering Inc.* 391 F.3d 190 (3d
Cir. 2005), SunTrust argues that the treatment proposed by the
Debtor represents impermissible "artificial impairment"

warranting negation of the accepting vote of the class.

Artificial impairment occurs when a Plan imposes an insignificant or *de minimis* impairment on a class of claims to qualify those claims as impaired under §1124.  The chief concern with such conduct is that it potentially allows a debtor to manipulate the Chapter 11 confirmation process by engineering literal compliance with the Code while avoiding opposition to reorganization by truly impaired creditors.  391 F.3d at 243.

In *Combustion Engineering,* the Circuit Court noted that there is nothing in either §1129(a)(10) or §1124 expressly prohibiting a debtor from "artificially impairing" the claims of creditors, but that various courts have found the practice troubling. *Id.* In the context of the large asbestos bankruptcy before it, the *Combustion Engineering* Court stated that it shared that concern. *Id.*  In *Combustion Engineering*, however, the Circuit Court stopped short of enunciating a *per se* rule that artificial impairment is prohibited.  It did note that the artificial impairment in the case before it might well be at odds with the spirit of §1129(a)(10), whose purpose is to provide some indicia of support [for a plan of reorganization] by effected creditors and prevent confirmation where such support is lacking. *Id.* at 244.  Citing favorably to *In Re Windsor On the River Associates*, 7 F.3d 127 (8th Cir. 1993), the Court of Appeals observed, further, that §1129(a)(10) requires that a plan of

51

reorganization pass muster in the opinion of creditors whose rights to repayment from the Debtor are implicated by the reorganization. *Id.*

SunTrust argues that the proposed treatment of Class 9 in this case represents *de minimis* or insignificant impairment which runs afoul of the teaching of *Combustion Engineering.* The Debtor disagrees. As noted above, this is a closer call than it might seem.

This Court notes, in the first instance, that the facts in *Combustion Engineering* were particularly egregious. In that case the Circuit Court found the Debtor to have "made a pre-petition side agreement with a privileged group of asbestos claimants, who as a consequence represented a voting majority despite holding in many cases only slightly impaired "stub claims." *Id.* at 244. The pre-petition payments made under those agreements exceeded any recovery obtainable by certain other asbestos claimants in the case. *Id.* Indeed some of the pre-petition agreement parties received as much as 95% of the full liquidated value of their pre-petition claims and therefore, per the Circuit Court, had little incentive to scrutinize the terms of the Debtor's proposed reorganization plan. *Id.* In fact, said the Circuit Court, they had the opposite incentive, given that favorable pre-petition settlements were conditioned at least implicitly on a subsequent vote in favor of the Plan. *Id.* Furthermore, the Circuit Court

52

noted that, because of certain release provisions originally in the Plan, the parties to the pre-petition agreements had a significant financial incentive directly opposed to non-participants. *Id.* at 244-45.

On those facts, the Circuit Court found the monitoring function of §1129(a)(10) to be significantly weakened. *Id.* at 244. Indeed, it found that the problem of manipulation was especially problematic in the asbestos context, where a voting majority could be made to consist of non-malignant claimants whose interests might be adverse to those of claimants with more serious injuries. *Id.* The Circuit Court concluded that the lower courts had failed to consider these conflicts, vacated confirmation of the plan, and remanded the case for further consideration of artificial impairment under §1129(a)(10). *Id.* at 245.

Given that the facts in *Combustion Engineering* were so troublesome, it is unsurprising that the Circuit Court noted that artificial impairment can bear as well on the confirmation requirements of §1129(a)(3); to wit: that a plan of reorganization be proposed in good faith. On that score, the Circuit Court noted that the important point of inquiry is the plan itself, and whether such a plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code. *Id.* at 246.

The facts in the present case do not begin to compare to those in *Combustion Engineering*.  There are no pre-petition side agreements with Class 9 claimants, let alone pre-petition agreements of a sort that in essence bought the votes of a subset of a class, at the expense of the remainder, for the purpose of engineering an accepting class.  Furthermore, LGA argues correctly that the degree of Class 9 impairment under its plan exceeds the much more nominal class impairment criticized in cases such as *Windsor On The River Associates*, *supra*, 7 F.3d at 132 (60 day delay in full payment); *In Re Dean*, 166 B.R. 949, 954 (D. N.M. 1994) (Delayed payment of $3,500 in total claims by 60 days); and *In Re Lettick Typographical Inc.*, 103 B.R. 32, 38-39 (Bankr. D. Conn. 1989) (payment to class delayed by a mere two weeks).  Based on this comparison, an argument could be made that the impairment of Class 9 in this instance is not actually "artificial."  Nevertheless, there is evidence of some "engineering" herein.

Easily the most problematic evidence on this point for LGA is the testimony of Mr. Field himself.  He candidly admitted that the additional 10% payment due unsecured creditors who did not elect the all cash option could be made available on the effective date of the Plan.  (N.T. 10/25/05 at 121-122)

At first blush this would appear to settle the question, but that would be hasty. It is clear that LGA's ability to make the

54

roughly $13,000,000 in payments called for on the effective date
of its plan hinges on its receipt of funds from a variety of
sources, all of which will be discussed in greater detail, *infra*,
and one of which is an infusion of cash from Mr. Field, in the
estimated amount of $500,000.00, to cover a projected shortfall
on the Debtor's end.  That being the case, the notion that the
Debtor has "manufactured" impairment which it could have
otherwise avoided, becomes far less certain. Indeed, in
challenging the feasibility of the Debtor's reorganization plan,
SunTrust itself has argued strenuously that the Debtor will not
have on hand anywhere near the funds necessary to make all
effective date payments.  At the very least, it is inconsistent
to argue on the one hand that the Debtor will fall short on the
effective date, and argue on the other hand that the Debtor could
easily increase amounts to be distributed to creditors on the
same date.

   In short, even if artificial impairment under all
circumstances is prohibited under *Combustion Engineering* (which
would require a particularly expansive interpretation of the
opinion) the evidence of artificial impairment as to Class 9 is,
on this record, inconclusive.

   A fair synthesis of the evidence seems to be that Mr.
Field's testimony merely underscores his determination to provide
whatever cash is necessary for the LGA Plan to go effective, and

that if that were to include a requirement to pay the unsecured
creditors class in full, he would do so.  SunTrust contends that
he should be forced to do so (effectively eliminating an impaired
accepting class), yet SunTrust then maintains, vociferously, that
the Plan is infeasible and is going to fail, *inter alia*, because
the monies needed on the effective date, including those coming
from Mr. Field, will not be there.  The unsecured creditors
class, for its part, obviously thinks the money will be there, a
fact which its accepting vote for the plan attests to.  There is
obvious risk in the unsecured creditors decision, for if
SunTrust's predictions come true the unsecured creditors class
are likely to take nothing.  Clearly, the unsecured creditors
class had every good reason to scrutinize the terms of the LGA
Plan, unlike the asbestos claimants in *Combustion Engineering*,
and clearly they did so.  SunTrust's dismissal of these facts
renders its position on this issue hopelessly inconsistent and
unpersuasive.

The Court, in sum, concludes 1) that the present situation
is quite unlike *Combustion Engineering*, 2) that the impairment of
Class 9 is arguably not de minimis and hence artificial, 3) that
even if it is, the accepting vote of Class 9 provides the indicia
of support for a plan by a class of affected creditors as
required under §1129(a)(10), and 4) that the structure of the LGA
Plan consequently A) does not violate the good faith requirement

of the Bankruptcy Code, and B) will fairly achieve a result consistent with the objectives and purpose of the Bankruptcy Code.  Accordingly, the accepting vote of Class 9 will be counted.

## b. **The Designation Motion**

As noted, the United States Trustee (UST) has filed a motion to deem G Holdings Corp. and Standard Trading Corp ("G Holdings and Standard" or "the Gross Entities") as insiders for purposes of claim voting and to have their claims equitably subordinated. The Motion is supported by SunTrust Bank and Brickman Transportation, which also seek by separate motion to have those same claims designated as not having been procured in good faith. G Holdings and Standard oppose the motion and they are supported by the Debtor.  A hearing on the Designation Motion was held on June 6, 2006.

The claims of G Holdings and Standard are members of a class impaired under the Debtor's plan.  The Code, as discussed, requires as a condition of confirmation that at least one impaired class accept the plan.  In determining whether an impaired class has accepted the plan, claims of insiders holding claims in that class are not counted:

> If a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, *determined without including any*

> *acceptance of the plan by any insider.*

11 U.S.C. §1129(a)(10) (emphasis added).  If G Holdings and

Standard Trading are insiders, then their claims may not be

counted for voting purposes.  The UST and SunTrust/Brickman

Transportation insist they are, while the Debtor and the Gross

Entities say otherwise.[14]

*Insiders Under the Bankruptcy Code*

The Bankruptcy Code provides the following definition, in

pertinent part[15]:

The term "insider" *includes*–

> **(i)** general partner in the debtor;
> **(ii)** relative of a general partner in,
> general partner of, or person in control of
> the debtor;
> **(iii)** partnership in which the debtor is a
> general partner;
> **(iv)** general partner of the debtor; or
> **(v)** person in control of the debtor;

11 U.S.C. §101(31)(C)(emphasis added).  By virtue of the

nonlimiting term "includes," the above definition is intended to

be illustrative rather than exhaustive.  *See* 11 U.S.C. §102(3);

*In re Schuman,* 81 B.R. 583, 586 (9th Cir. BAP 1987).  Legislative

---

[14] The Debtor asserts that the issue of the Gross entities' insider
status is moot given that it has already obtained sufficient votes from
that class accepting its plan without including those purchased by the
Gross Entities. The Court need not belabor this point, as conduct which
would warrant the relief sought in the Designation Motion implicates the
good faith requirement of §1129(a)(3), thus independently warranting
consideration of the allegations.

[15] The Debtor is a limited partnership.

history suggests that, in addition to the individuals and
entities actually named, the term also encompasses anyone with "a
sufficiently close relationship with the debtor that his conduct
is made subject to closer scrutiny than those dealing at arm's
length with the debtor." S. Rep. No. 989, 95th Cong.2d Sess.,
*reprinted in* 1978 U.S.C.C.A.N. 5787, 5810.  In ascertaining
insider status, then, courts have looked to the closeness of the
relationship between the parties and to whether any transactions
between them were conducted at arm's length. *See, e.g., In re
Holloway,* 955 F.2d 1008, 1011 (5th Cir.1992); *In re Schuman,* 81
B.R. at 586.  At bottom, whether or not an individual or entity
will qualify as an insider is a question of fact.  2 *Collier on
Bankruptcy* ¶ 101.31 (Matthew Bender 15th ed. Revised).

The factual record in this matter consists of the testimony
of the two principals, Martin Field of the Debtor and Harry Gross
of G Holdings and Standard, as well as subsequent email
correspondence.  As to Messrs. Field and Gross, the Court notes
that neither is related to the other; neither owns any interest
in a corporation or enterprise controlled by the other; they do
not see each other on a social basis; they have spoken less than
ten times; they are competitors in the hotel business but
consider their acquaintance to be friendly.  (N.T. 6/6/06 at
36,41,42,52,65)

In this instance, Field recalls that it was Gross who first

called him.  (N.T. 6/6/06 at 15)  Field recalls that Gross was
interested in making an investment in the hotel so the subject of
claims purchasing came up.  (N.T. 6/6/06 at 16) Gross was
inquiring about the labor strike at the hotel and asked how he
could help in the bankruptcy.  (N.T. 6/6/06 at 59)  By "help,"
however, Gross was not motivated by altruism.  (N.T. 6/6/06 at
60)  Gross says that he had a financial motive in buying claims
but that interest was secondary: what he was really concerned
about was the potential entree of Brickman into the local hotel
market.  (N.T. 6/6/06 at 64)  To Gross, it would be better to
have Field as a competitor as opposed to Brickman, who was an
unknown in the hotel business.[16]  *Id*.  Gross recalls that the two
discussed some numbers while Field remembers mentioning that his
plan would pay 90%.  (N.T. 6/6/06 at 62, 43)  But that was the
extent of their discussion: Gross made no promises to Field about
purchasing claims or voting for or against the plan; neither did
Field offer any consideration to Gross for purchasing claims or
voting for the plan.  (N.T. 6/6/06 at 62, 42) Ultimately, Gross
invested $85,000 in claims purchases.

　　　After that meeting, the parties' relationship continued via

---

[16]And it mattered not to Gross that his hotel was adjacent not to the
hotel which is the subject of this proceeding (at the LaGuardia airport)
but that which is adjacent to the hotel owned by Field at the JFK
airport.  Gross felt affected by all of the hotels in the New York
airport market.  (N.T. 6/6/06 at 72)

email.  On January 4, 2005, Field[17] wrote J.R. McKechnie, Gross'
in-house counsel, to confirm their "mutual understanding."  Ex.
T-1.  Field recalls that he and Gross agreed that Gross would try
to acquire 2/3 of the total unsecured debt by offering those
creditors 60 cents on the dollar.  That would come to about
$250,000.[18]  *Id*.  Field then goes onto explain how much in
numbers and dollar amount of claims is needed to confirm a plan.
*Id*.

McKechnie responded about an hour later.  *See* Ex. T-2.  He
confirmed the "understanding of the discussions" with certain
exceptions.  McKechnie understood the $250,000 to be a maximum
amount that Gross would invest because some larger creditors had
already indicated support for the plan.  In addition, McKechnie's
review of the unsecured creditor body revealed that the total
amount was higher than Field represented.  In closing, McKechnie
felt confident that Gross would participate in the claims buying
process but would need to know the exact amount of claims already
on board with the plan.  *Id.*

Field responded to McKechnie later that afternoon.  He
explained that he had commitments from the larger creditors so

---

[17]It is Field's practice to dictate email to his assistant.  That
explains why Field is not the sender of the email though signing off at
the bottom.  (N.T. 6/6/06 at 8)

[18]Field believed that total unsecured claims equaled $600,000.  Two-
thirds of $600,000 is $400,000, whence the investment of $250,000.  *See*
Ex. T-2.

Gross' investment would not exceed the $250,000 figure.  What now concerned Field, however, was the bondholders' competing proposal.  This meant that time was now of the essence so he urged the Gross Entities to start buying claims right away.  Ex. T-3.

It appears that McKechnie did just that.  Later that week, he commenced the solicitation of claims.  He exchanged emails with Gary Isenberg, manager of the Debtor's hotel.  He confirmed that one creditor, Filco Carting, had agreed to accept 60% for its claim.  Ex. T-4.  On the same day, Isenberg relayed to McKechnie a request for an offer from another creditor.  Ex. S-2.  Three weeks after that, McKechnie sent an email to Isenberg regarding customer information which Isenberg had provided.  McKechnie remarked that the information was not always helpful in contacting the person who would have authority to sell the claim.  Ex. S-4, T-5.  On January 31, Field requested from McKechnie a list of the creditors who "signed off" and McKechnie responded with that information the same day.  Ex. S-1.  On March 25, 2005, Isenberg emailed McKechnie to inquire regarding the claims purchasing.  He received a response that day.  Ex. S-5.  About two months later, Isenberg emailed McKechnie to report on a meeting between the Debtor and the Creditors Committee.  Containing the heading "GOOD NEWS", the email informed McKechnie of the Committee's report that it had rejected the bondholders

proposal.  Ex. T-6.

*The Parties Asserting Insider Status*

For the UST, the emails demonstrate an intent to control a voting class.  The UST argues that these emails show that Gross and Field agreed that Gross' companies would buy sufficient claim to the impaired class of unsecured claims; that Field explained to Gross' attorney exactly how many claims needed to be bought; that Field requested and received updates from Gross' attorney as to how many claims were purchased; and that Field reported to Gross' attorney that the Committee rejected the bondholders plan which proposed a higher percentage.  This, says the UST, constitutes cooperation by two parties—one of whom (Field) is per se an insider while the other (Gross) acted at the other's behest—to gain control of a class of impaired creditors.  (*See* N.T. 6/6/06 at 75-77)

Likewise, SunTrust and Brickman Transportation focus on the email correspondence to argue that Field, through Gross, sought to control the voting of a particular class.  What exists here, SunTrust maintains, is a principal/agent relationship whereby Gross' companies acted as agent for Field, an insider.  The Debtor gave Gross "extraordinary" assistance in soliciting creditor claims to obtain an accepting impaired class.  Such "collaboration," SunTrust argues, requires the Court to find that Gross acted as an insider in this context.  (N.T. 6/6/06 at 77-

63

80)

*Those Disputing Insider Status*

The Debtor, G Holdings and Standard dispute the foregoing premise.  The Debtor sees nothing wrong with the assistance that it gave the Gross Entities here.  That help, it says, consisted of nothing more than providing names and addresses of creditors. Indeed, it argues that the Debtor was duty bound to give that information to any creditor requesting it.  It does not, however, equate with control or influence over that class of creditors. Moreover, the Debtor wonders why it is that SunTrust is permitted to purchase claims to defeat a plan while the Debtor, under the Trustee's reasoning, is not allowed to do the same to confirm one.  (N.T. 6/6/06 at 84)  This latter argument, i.e., that claims purchasing should be no less available to those supporting a plan as well as to those opposing it raises larger concerns. The Court will pause to address them.

*Claims Purchasing and Competing Plans*

The Code allows for the filing of competing plans.  *See* 11 U.S.C. §1121(c).  Although more than one plan may meet the confirmation requirements set forth in subsections (a) and (b) of §1129, the Court may confirm only one plan:

> Notwithstanding subsections (a) and (b) of
> this section and except as provided in
> section 1127(b) of this title, the court may
> confirm only one plan, unless the order of

> confirmation in the case has been revoked
> under section 1144 of this title. If the
> requirements of subsections (a) and (b) of
> this section are met with respect to more
> than one plan, the court shall consider the
> preferences of creditors and equity security
> holders in determining which plan to confirm.

11 U.S.C. §1129(c).  As the statute plainly states, it is the

interests of creditors and equity security holders which are the

Court's paramount concern.  One court has observed how the

practice of buying claims may sometimes subvert that policy:

> Thus, when the court is forced to make the
> choice under Section 1129(c), one of the
> groups that has input into the decision is
> the creditors. One may reasonably infer, from
> the structure of Section 1129 generally, that
> Congress had in mind the considerations of
> independent third parties when it directed
> courts to accede to the desires of creditors
> in Section 1129(c), rather than the wishes of
> an insider. When the debtor, in the context
> of competing plans, buys up blocking claims
> in an important "swing class" consisting of
> such independent third parties (whether
> directly or indirectly, as here), it is
> effectively stacking the deck on the Section
> 1129(c) issue, undercutting the ability of
> the court to properly "consider the
> preferences of creditors" as directed by the
> statute. *See In re Allegheny International,
> Inc.,* 118 B.R. at 299; *see also In re
> MacLeod,* 63 B.R. at 656 (competitor acquired
> blocking position for ulterior purpose of
> destroying or injuring the debtor, so that
> the interests of its competing business would
> be furthered).

> Sanctioning claims acquisition for purposes
> of blocking an opponent's plan would also
> ignite a scramble for votes conducted almost

65

entirely outside the Code's carefully
developed structure (plan, disclosure
statement, equal treatment, regulated
solicitation, court-supervised confirmation),
leaving creditors to select not the best plan
but the best deal they might be able to
individually negotiate. Creditors would be
paid, no doubt, but not equally, and not on
the basis of accurate information. Such a
wild free-for-all may appeal to the
entrepreneurial capitalist, but it also
issues a gilt-edged invitation to fraudulent
and corrupt practices, to say nothing of
ramifications of buying claims in exchange
for forbearance, a potential violation under
the federal criminal code. *See* 18 U.S.C.
§152; *see also In re Featherworks Corp.,* 25
B.R. 634, 641 (Bankr.E.D.N.Y.1982). Needless
to say, such an invitation cannot responsibly
be issued by this court.

The argument that "we needed to do it to them
before they did to us" is flawed in at least
two respects. First, the conduct on the part
of RTC could have earned similar condemnation
and disqualification, for precisely the same
reasons, i.e., their sole purpose, as the
evidence indicated at the hearing, would have
been to defeat the confirmability of Debtor's
Plan. *See In re Federal Support Co.,* 859 F.2d
at 19; *but see In re P-R Holding Corp.,* 147
F.2d at 897; *In re Gilbert, Inc.,* 104 B.R. at
216. Second, such a rationale, if accepted,
would no doubt become the favorite *excuse* to
justify such tactics in the future. Courts
would be forced into speculating about what
some other party was "going to do." What
should a court do under such an inquiry if it
determines that the debtor honestly held the
fear, but that the fear was not justified?
The question itself suggests the futility of
such a legal standard.


*In re Applegate Property, Ltd.*, 133 B.R. 827, 835-36

(Bankr.W.D.Tex. 1991).  The maneuvering by the parties in this case implicates those very concerns.  Field urged the Gross Entities to act quickly in buying claims because of the competing offer of the Bondholders.  *See* Ex. T-3.  While that does not cause the Court to conclude that Gross Entities are insiders, it is indisputable that the selling creditors were effectively precluded from considering the other offer.  In turn, this prevents the Court from determining which offer would have better served those creditors.  For that reason, the Court cannot sign on to the Debtor's proposition that claims acquisitions may become a free-for-all outside of the statutory framework.

For their part, the Gross Entities argue that there is no evidence whatsoever of an agency relationship.  Gross retained the right to vote its claim however it chose. (N.T. 6/6/06 at 92) As to the claim of "extraordinary collaboration" between Gross and the Debtor, Gross sees this as a mischaracterization: all that was provided were names of creditors, their addresses and telephone numbers.  *Id*.  The Debtor would have given such information to anyone requesting it.  *Id.*[19]

The Court finds the Debtor and the Gross Entities to have the better argument.  The cases which the UST and SunTrust rely on are distinguishable.  The extent of closeness or control in

---

[19] The Creditors Committee similarly sees no evidence of a principal-agency relationship and, therefore, supports the Debtor and the Gross Entities. (N.T 6/6/06 at 81-82)

the cited cases is absent from this record.  In *Three Flint Hill*[20], the purchaser of the claims was a friend and business associate of some of the partners of the debtor.  In *Holly Knoll*,[21] the claims purchasing creditor was a real estate company owned by children of the Debtor's sole shareholder.  In *Applegate*[22], the Debtor's principal was also an officer of the entity that was purchasing claims and both the purchaser and the Debtor were sister corporations of a larger business entity.

Nothing like that is to be found in this record.  To reiterate, Gross and Field were competitors in the same hotel market and that is the extent of their relationship.  To the Court, it also bears repeating that it was Gross who initiated the discussion which led to the claims purchasing.  Moreover, Gross provided very clear explanations as to why he purchased claims: first, to ensure that a hotel owner with a proven track record stayed in the market; and, second, to make money.  As he explained, he never acted here gratuitously or charitably.  The Court finds Mr. Gross' testimony to be credible.  Moreover, it is

---

[20] *See Three Flint Hill, Ltd., Partnership,* 213 B.R. 292, 299 (D.Md.1997).

[21] *See In re Holly Knoll Partnership,* 167 B.R. 381, 387 (Bankr.E.D.Pa. 1994)

[22] *See In re Applegate Property, Ltd.,* 133 B.R. 827, 832-33 (Bankr.W.D.Tex. 1991)

almost completely consistent with that of Mr. Field.[23]  To the
Court, the evidence reflects that the parties' dealings remained
at arms length throughout.  For that reason, the Court does not
find that G Holdings or Standard are "insiders" for purposes of
disqualifying them from voting.

*Equitable Subordination*

The moving parties contend that the claims purchased by G
Holdings and Standard should be subordinated on equitable
grounds.  In that regard, §510 of the Bankruptcy Code provides
that the Court may apply principles of equitable subordination to
all or part of an allowed claim or interest.  11 U.S.C.
§510(c)(1).  Before ordering equitable subordination, most courts
have required a showing involving three elements: (1) the
claimant must have engaged in some type of inequitable conduct,
(2) the misconduct must have resulted in injury to the creditors
or conferred an unfair advantage on the claimant, and (3)
equitable subordination of the claim must not be inconsistent
with the provisions of the bankruptcy code.  *Citicorp Venture
Capital, Ltd v. Committee (In re Papercraft)*, 160 F.3d 982, 986-
87 (3d Cir.1998) (citing *U.S. v. Noland,* 517 U.S. 535, 538, 116
S.Ct. 1524, 1526, 134 L.Ed.2d 748 (1996)) (describing existing

---

[23] Perhaps the only point on which the two are not completely in sync
is their "understanding" of the results of their meeting.  Field seems
to come away believing that claims would indeed be purchased by Gross'
companies (*see* email at Ex. T-1).  Gross' testimony is not clear on that
point.

case law as consistent with the three part test identified in *In re Mobile Steel Co.,* 563 F.2d 692, 700 (5th Cir.1977)).  Once again, the record does not support the charges.

As to inequitable conduct on the part of either G Holdings or Standard, the Court sees none.  It appears that the principal of both entities, Mr. Gross, contacted the Debtor's principal, Mr. Field, inquiring about the labor strike at Field's hotel.  He bought claims intending to vote in favor of the Debtor's reorganization for strategic reasons: he believed that it would be better for Gross' long term interests if the Debtor continued to run that hotel.  He thus acted in his own self-interest—not that of Field—when he chose to buy claims.  The Court finds nothing wrong with that.

As to injury to creditors or unfair advantage[24] to the Gross Entities, the record suggests little.  The UST maintains that selling creditors were deprived of the right to the higher offer

---

[24]  Because the three elements of equitable subordination appear to be stated in the conjunctive, a finding of no inequitable conduct would at first blush settle the matter.  However, the Third Circuit in *In re Burden v. United States,* 917 F.2d 115, 120 (3d Cir.1990), concluded that "creditor misconduct is not [always] a prerequisite for equitable subordination." *Burden* involved subordination of a tax penalty in the absence of government misconduct. The Supreme Court, in two recent cases regarding the standards for tax penalty subordination, has refused to decide whether misconduct is required under §510(c), resolving each case on the principle that "categorical" subordination is not permissible.  *See United States v. Reorganized CF & I Fabricators of Utah, Inc.,* 518 U.S. 213, 229, 116 S.Ct. 2106, 2115, 135 L.Ed.2d 506 (1996); U.S. vs. *Noland,* 517 U.S. 535, 543, 116 S.Ct. 1524.  For that reason, the Court's analysis will proceed through the remaining two elements.

from the Bondholders.  UST Motion, ¶ 27.  The same, however,

could be said of those creditors who sold out to different claims

purchasers.  Similarly, there is no evidence of unfair advantage

gained by Gross.  His investment did not yield control over his

class and, for that matter, the total amount invested was

relatively small.  In sum, there is no basis to conclude that

treating Gross differently from other unsecured creditors is

consistent with the provisions of the Code.  Accordingly, there

are no grounds for equitable subordination.

*Claim Designation Under §1126(e)*

     SunTrust requests that the claims of both G Holdings and

Standard be designated as not having been procured in good faith

pursuant to Code §1126(e).  If so designated, those votes would

not be counted in determining whether their class accepted or

rejected the plan.  *See* 11 U.S.C. §1126(d).  The issue of claim

designation has been examined by Chief Judge Sigmund of this

Court.  *See In re Lehigh Valley Professional Sports Clubs, Inc.*,

2001 WL 1188246 (Bankr.E.D.Pa.)  The Chief Judge's explication

aids in an understanding of the purpose of that provision and is,

therefore, worth quoting at length:

          Section 1126(e) and its predecessors, §203 of
          the Bankruptcy Act and Chapter X Rule 10-305,
          were intended to prevent creditors and
          stockholders, "by use of obstructive tactics
          or of hold-up techniques, from exacting for
          themselves advantages through acceptance or
          rejection of a plan, or to secure some

preferential treatment such as management of
the company for the price of their vote." 5
*Collier on Bankruptcy*, ¶ 1126.05[1] at 1126-
19 (15th ed.1993). *See also Young v. Higbee
Co.*, 324 U.S. 204, 210-11, 65 S.Ct. 594, 597-
98, 89 L.Ed. 890 (1945) (The purpose of
imposing a good faith requirement on the
voting process was to prevent the use of
"obstructive tactics and hold up techniques"
to procure an unfair advantage over other
creditors in the confirmation process). "Good
faith" was not defined under §203 or Rule 10-
305; rather its definition was left to be
developed by case law. According to case law,
the definition of good faith appears to be
"whether those parties in interest with
respect to whom a motion for disqualification
is made, had some ulterior reason for their
action which looked to some special advantage
to be gained thereby." *Id.* (*citing American
Mutual Life Insurance Company v. City of Avon
Park,* 311 U.S. 138, 61 S.Ct. 157, 85 L.Ed. 91
(1940)). In the context of purchased claims,
the test generally accepted by most courts
was articulated in *In re Allegheny
International, Inc.,* 118 B.R. 282, 289
(Bankr.W.D.Pa.1990):

"The mere fact that a purchase of creditors'
interests is for ··· securing the approval or
rejection of a plan does not of itself amount
to 'bad faith.' When that purchase is in aid
of an interest other than an interest as a
creditor, such purchases may amount to 'bad
faith' under section 203 of the Bankruptcy
Act." Id. ( *quoting In re P-R Holding Corp.,*
147 F.2d 895, 897 (2d Cir.1945)). *See also In
re Gilbert,* 104 B.R. 206 (Bankr.W.D.Mo.1989);
*In re MacLeod Co., Inc.,* 63 B.R. 654
(Bankr.S.D.Ohio 1986). Nonetheless, it is
clear that creditors are not "expected to
approach reorganization plan votes with a
high degree of altruism and with the desire
to help the debtor and their fellow
creditors." *Figter Limited v. Teachers
Insurance and Annuity Association of America
(In re Figter),* 118 F.3d 635, 639-40 (9th
Cir.1997). According to the *Figter* Court,

"Far from it."

"If a selfish motive were sufficient to
condemn reorganization policies of interested
parties, very few, if any, would pass muster.
On the other hand, pure malice, "strikes" and
blackmail, and the purpose to destroy an
enterprise in order to advance the interests
of a competing business, all plainly
constituting bad faith, are motives which may
be accurately described as ulterior. That is
to say, we do not condemn mere enlightened
self interest, even if it appears selfish to
those who do not benefit from it." 118 F.3d
at 639, *quoting In re Pine Hill Collieries
Co.,* 46 F.Supp. 669, 671 (E.D.Pa.1942). *See
also In re A.D.W. Incorporated,* 90 B.R. 645,
649 (Bankr.D.N.J.18).

2001 WL 1188246 *3. SunTrust argues that Gross acted with an

ulterior motive, i.e., to obtain some advantage over other

creditors. *See* SunTrust Motion, ¶35.

Again, Gross' candor about his interest in the outcome of

the Debtor's reorganization leads the Court to conclude nothing

untoward about his motives. What is underscored by Gross'

testimony is the difference between a strategic interest (Gross')

in the outcome of the bankruptcy versus a financial one

(SunTrust's). It is inaccurate to say, as SunTrust does, that

Gross' motivations here were not primarily profit driven. To the

contrary, Gross' testimony reveals that he took a longer view of

how the bankruptcy interest would affect his profits. He felt it

best for him if a hotel in his market was run by someone with

experience in the industry. Moreover, he stood to profit on the

claims he purchased under either plan.  While the bondholders
were offering full payment plus a premium, the Debtor was
offering 90%.  Given the amount actually invested ($85,000) the
differential may not have been all that important to him.  For
all of these reasons, the Court does not find that the Gross
Entities acted in bad faith and will not, therefore, deny them
the right to vote.

The Designation Motion will, therefore, be denied in its
entirety.

### c.  <u>Class 10</u>

Class 10 presents an entirely different question.  Class 10
consists of the claim of Holiday Hospitality Franchising Inc.
("Holiday").  Holiday filed an unsecured claim on April 14, 2005
in the amount of $126,792.91.  The Plan provides that the entry
of the Confirmation Order will constitute the assumption of the
Debtor's license (franchise) agreement.  Holiday initially voted
to reject the LGA Plan.  It changed its vote and accepted the
Plan after stipulating with the Debtor to allowance of its pre-
petition claim in the amount of $265,000.00, such sum to be paid
in equal monthly installments over a two year period, beginning
on the effective date of the Plan, with interest at the rate of
5% per annum.

The Debtor maintains that Holiday constitutes a second
impaired accepting class.  SunTrust disagrees, arguing that the

franchise/license agreement between the Debtor and Holiday is an executory contract and that, because the contract is being assumed under the Plan, Holiday has no "claim" against the estate, and hence does not qualify as a creditor entitled to vote on the Plan.  In this regard, SunTrust relies on certain decisions which have held that a class of tenants under unexpired lease agreements that were being assumed under a plan did not qualify as an impaired accepting class.  *In re Boston Post Road Limited Partnership*, 21 F.2d 477, 484 (2d Cir. 1994) *aff'd*, 154 B.R. 617 (D. Conn. 1993) *aff'd,* 21 F.3d 477 (2d Cir. 1994); *In re Duval Manor Associates*, 198 B.R. 94, 98-99 (Bankr. E.D. Pa. 1996) *rev'd on other grounds*, 203 B.R. 42 (E.D. Pa. 1996)

The Debtor concedes that the agreement with Holiday is an executory contract, but argues that the foregoing decisions involving unexpired leases do not dictate the same result in the case of executory contracts.  The Debtor argues further that, even if unexpired leases and executory contracts warranted the same general treatment, the facts of the cases that SunTrust points to are distinguishable, in turn warranting a different specific result herein.  Neither of these arguments holds up.

The Debtor criticizes SunTrust's equating executory contracts with unexpired leases for present purposes, arguing that SunTrust fails to cite any legal authority for such proposition.  Yet, the Debtor cites no legal authority for its

own contention that different treatment of the two is
appropriate.  The Court, for its part, has found no support for
the Debtor's position.[25]  Neither can the Court think of any
logical reason to differentiate between the two.  11 U.S.C. §365
covers both unexpired leases and executory contracts, and
provides that in order to assume either, the Debtor must, *inter
alia*, cure or provide adequate assurance that it will promptly
cure, pre-petition defaults.  A cure, on whatever terms it takes,
eliminates the contract party's claim against the estate.  A
subsequent breach of an assumed executory contract creates an
administrative expense claim.  As noted in Collier's - "this
suggests that a Trustee or a debtor in possession should proceed
cautiously in electing to assume a contract or lease, since an
assumption will have the effect of making the expenses or
liabilities incurred, expenses of administration.  *See generally*
3 COLLIER ON BANKRUPTCY ¶ 365.09 [5]  (Matthew Bender 15th Ed.
Revised 2000) Accordingly, the Court rejects this aspect of the
Debtor's argument.

     The foregoing conclusion renders any extended discussion of

_____

     [25] The Court notes the Debtor's reliance on *In Re Cochise College
Park Inc.*, 703 F.2d 1339, 1352 n. 11 (9th Cir. 1982) ("the non bankrupt
party to an executory contract that has been breached, as a general
unsecured creditor of the estate, has a provable claim against the estate
arising from the breach.")  This decision is inapposite, as in that case
the contract at issue had not been assumed, and the Court's discussion
proceeded from that predicate.  The result herein would be no different
from the result in *Cochise* if the Holiday agreement were being rejected,
but it is not.

the Debtor's second argument unnecessary, but for the sake of completion, the Court will briefly address it.  The Debtor argues that, if it were legitimate to treat unexpired leases and executory contracts differently, the unexpired lease decisions relied upon by SunTrust should not govern the outcome herein, because those cases involved tenant's rights to receive back their security deposits upon termination of their leases.  These rights, argues the Debtor, were inchoate, since the leases were being assumed, not terminated.  Thus, says the Debtor, the tenants in those situations had no present claims against the estate.  The Debtor emphasizes that in this instance Holiday has a present monetary claim against the estate, based on a pre-petition default under the parties' agreement.  The Court agrees that this is a distinction between the two situations, however it has no legally cognizable significance.  Holiday's pre-petition claim must still be "cured" as required under §365 of the Bankruptcy Code as a condition to assumption of the agreement, and the cure, in whatever form it takes, eliminates Holiday's claim.

The Court will turn next to the question of whether LGA's Third Amended Plan of Reorganization meets the remaining requirements of §1129(a), such that confirmation under §1129(b) may, in turn, be sought.  Prior to this, however, a description of the terms of the LGA Plan, not heretofore described, is in

order.

### 2.  <u>Claims other than that of SunTrust</u>

The Court has already described the treatment which the Plan proposes for Holiday and the general unsecured creditor body. Beyond this, the Plan proposes full payment to four classes of creditors by either the effective date of the Plan or its first anniversary.  In the former category are employee claims, priority tax claims, and the claims of Brickman Airport Receivables.  In the latter category is a $41,000.00 secured claim, originally held by Sovereign Bank, but now held by Brickman Airport Transportation.  A small secured vehicle claim originally held by CitiCapital Commercial Corporation, but now also held by Brickman Airport Transportation, is to be brought current on the effective date of the Plan and thereafter paid in accordance with the terms of the loan agreement.

The claim of the estate of Joseph Selig, an insider and the holder of a junior mortgage on the hotel, is to be paid in full in accordance with its terms, however no payment is to be made on the Selig claim until the claim of SunTrust is paid in full.

Claimants in Class 11, an insider class denominated as "affiliated unsecured creditors" are to receive, on the effective date, a cash flow note which will bear interest but provide for no payments from the Debtor until the later of i) payment in full of priority tax claims, the claim of Brickman Airport

78

Receivables, and the claim of Sovereign Bank acquired by Brickman Airport Transportation, and ii) payment of two bond sinking funds installments coming due on or after November 1, 2006.  The Plan adds, however, that in all events, payments to affiliated unsecured creditors may only be made if the reorganized debtor is current in required deposits to the LGA Bonds debt service and capital reserve funds.

### 3.  **Claim of SunTrust**

The Plan describes the allowed claim of SunTrust as consisting of 1) mandatory sinking fund installments on the LGA Bonds due and payable on November 1 of the years 2003 through 2005 (matured sinking fund installments), 2) sinking fund installments due and payable on November 1 of the years 2006 through 2028 (unmatured sinking fund installments), 3) accrued but unpaid interest on the LGA Bonds, and 4) assessable fees and charges, including reasonable attorneys fees, provided for under the Bond documents and allowed by the Court.

Under the Plan SunTrust will retain its liens against the property of the reorganized Debtor to the same extent as they existed on the effective date of the Plan.  As of the effective date SunTrust will thus have all of the liens it held before the effective date, except as to the Outparcel. The Plan also provides, as to the Bonds, for full payment on the effective date of 1) allowed fees and charges, 2) accrued but unpaid interest,

79

and 3) matured sinking fund installments.  Unmatured sinking fund installments are to be paid in annual installments on the second business day preceding November 1 of each year commencing October 30, 2006, with interest per annum equivalent to the coupon rate of the two sets of bonds, until the claim of SunTrust is paid in full.

**C.    Satisfaction of the Remaining Confirmation Requirements of §1129(a)**

LGA insists that its Plan meets all of the confirmation requirements of §1129(a)(save for §1129(a)(8)).  SunTrust disputes this.  Most of the provisions of §1129(a) are obviously satisfied, however, and can be dealt with quickly.  On this score, the Court finds that the Plan clearly satisfies 11 U.S.C. §1129(a)(1), (2), (4), (5), (6), (7), (9), (12)and (13).[26]  The Court has separately addressed and found the Plan to comply with §1129(a)(10).  The remaining areas of contention run to §1129(a)(3)(Good Faith) and (a)(11)(Feasibility) The Court will consider these in detail.

**1. Feasibility**

Other than valuation, no issue in this case generated more controversy than the feasibility of the Plan.  SunTrust argues

---

[26] The Court notes that the provisions of §1129(a)(6) may or may not be implicated depending upon the type of entity the Debtor forms to take title to the Outparcel.  If the entity proves to be a corporation, minor amendment to the Plan will be needed.

vociferously that LGA is overburdened by both a suffocating level
of debt and an inadequate capital structure, and that it cannot
generate adequate cash flow to meet its going forward cash needs.
As a result, says SunTrust, the Plan is wholly infeasible.  The
Debtor, needless to say, rejects this doomsday scenario.  The
Debtor argues that the evidentiary record provides reasonable
assurance that the Debtor can comply with the Plan's terms and
effectuate a reorganization.  It faults SunTrust for, in essence,
demanding that the Court apply an incorrect legal standard to
this case by requiring LGA to prove that the success of its Plan
is absolutely guaranteed.

Certainly, the Debtor is correct that a guarantee of success
is not required.  The standard for feasibility, rather, is one of
reasonableness.  Applicable law on this point is articulated
cogently in a leading bankruptcy law treatise:

> Section 1129(a)(11) requires as a condition
> of confirmation that the court find that
> confirmation ''is not likely to be followed
> by the liquidation, or the need for further
> financial reorganization, of the debtor or
> any successor to the debtor under the plan,
> unless such liquidation or reorganization is
> proposed in the plan.''  This standard has
> roots in the 1898 Act but has developed its
> own jurisprudence since the Code's adoption.
>
> Section 1129(a)(11) requires courts to
> scrutinize carefully the plan to determine
> whether it offers a reasonable prospect of
> success and is workable. Courts have
> expressed this standard in various ways. The
> Court of Appeals for the Second Circuit has
> stated that ''the feasibility standard is

whether the plan offers a reasonable
assurance of success. Success need not be
guaranteed.''  The Court of Appeals for the
Tenth Circuit is in accord: '' 'The purpose
of section 1129(a)(11) is to prevent
confirmation of visionary schemes which
promise creditors and equity security holders
more under a proposed plan than the debtor
can possibly attain after confirmation.' In
determining whether a plan meets the
requirements of §1129(a)(11), ... . 'the
bankruptcy court has an obligation to
scrutinize the plan carefully to determine
whether it offers a reasonable prospect of
success and is workable.' ''  Several courts
have considered the following factors when
determining if a plan is feasible:

> (1) the adequacy of the debtor's capital
structure;
> (2) the earning power of its business;
> (3) economic conditions;
> (4) the ability of the debtor's
management;
> (5) the probability of the continuation
of the same management; and
> (6) any other related matters which
determine the prospects of a sufficiently
successful operation to enable performance of
the provisions of the plan.

Although creditors sometimes press the issue,
the possibility of failure is not fatal.  As
one court noted: ''The Code does not require
the debtor to prove that success is
inevitable, and a relatively low threshold of
proof will satisfy §1129(a)(11) so long as
adequate evidence supports a finding of
feasibility."

7  *Collier on Bankruptcy* ¶ 1129.03 [11] (Matthew Bender 15th Ed.

Revised) (Footnotes omitted.)


There are two aspects to the instant feasibility issue which

must be separately considered: the first goes to the Debtor's

ability to make the payments its Plan calls for on the effective date; the second goes to the Debtor's ability to meet its future obligations under the Plan based upon the rate of interest which is fixed for its bond indebtedness.  The Court will address each question in turn.

### a. **Effective Date Payments**

The Debtor's Plan calls for disbursement of approximately $13,000,000 on the effective date.  Debtor's Exhibit D-74 details both the distributions and the anticipated sources of funds.

Gary Eisenberg, the executive vice president for operations of New Penn, was examined on this issue in March 2006.  (See also, Ex D-74)  According to Mr. Eisenberg, the Debtor proposes to make the following payments on the effective date of the Plan:

| | |
|---|---:|
| 1) Brickman Airport Receivable loan payoff - | $70,000.00 |
| 2) Payment to Bondholders for release of lien on the Outparcel - | $1,000,000.00 |
| 3) Transaction costs of obtaining a working capital loan - | $200,000.00 |
| 4) Payment to unsecured creditors - | $900,000.00 |
| 5) First installment payment to Holiday Inn - | $65,000.00 |
| 6) Accrued interest on the LGA Bonds - | $7,598,850.00 |
| 7) Chapter 11 administrative costs - | $500,000.00 |
| 8) Deposit to debt service reserve fund - | $1,435,530.00 |
| 9) Payment of priority tax claims - | $100,000.00 |
| 10) Past due principal amortization on LGA Bonds - | $1,230,000.00 |
| Total: | $13,099,380.00 |

Mr. Eisenberg identified the following sources for funding these distributions:

| | |
|---|---:|
| 1) Estimated Cash on Hand | $5,700,000.00 |
| 2) Estimated Cash flow from the property | $720,871.00 |
| 3) Sale of the Outparcel | $3,500,000.00 |
| 4) Proceeds from a working capital | |

83

|  |  |
|---|---|
| line of credit | $2,200,000.00 |
| 5) Estimated Sale of rights to | |
| operate a rooftop antenna | $700,000.00 |
| 6) Estimated Investment from partners | $500,000.00 |
| Total: | $13,320,871.00 |

SunTrust attacks the viability of the entirety of the above scenario. Specifically, SunTrust argues 1) that the Debtor's incompetent operation of the property will drain any "cash on hand," 2) that legal constraints preclude sale of the Outparcel as contemplated, 3) that as of the close of the hearing, the Debtor had no commitment letter from a working capital lender, 4) that the sale of rights to operate a rooftop antenna is too speculative, 5) that the viability of a capital infusion from partners is low, and finally, 6) that the Plan understates the Debtor's obligations to SunTrust due to the omission of default rate interest and attorney fees.  None of these arguments may be lightly dismissed, accordingly, each will be addressed.

### (1) **Cash on Hand**

SunTrust's skepticism and its criticism of the Debtor's performance is based mainly on the fact that first quarter performance in 2006, and performance looking back a year from that period (the hotel's trailing 12 months' earnings) were weak, and at or below projections.  While that is in fact true, it is also true that the Debtor's year to date performance through May 31, 2006, and its trailing 12 months' performance based on that date, have improved dramatically in virtually every measurable

category.  In that respect, total revenue, net revenue, and gross operating profit are all up sharply. For the trailing 12 months, average daily rate is also up sharply, while occupancy is up slightly.  Through May 31, 2006, the Debtor is ahead of its calendar year projections in occupancy, daily rate, room revenue, food and beverage revenue, and gross operating profit.  (N.T. 6/20/06 beginning at page 291; Exhibits D-74, 75 and 82)[27] SunTrust dismisses this trend, but it reflects a compelling turnaround, which bodes well both for the Debtor's ability to make its effective date payments and for the overall feasibility of its Plan.

### (2) **Sale of the Outparcel**

LGA proposes to sell the Outparcel for $3,500,000 to a newly formed entity that will be 100% owned by LGA.  The purchase price is expected to come from a loan from Grand Pacific Finance Corporation.  The Grand Pacific Loan commitment apparently expired in April, 2006, leading SunTrust to argue that the financing has failed.  Such a conclusion, however, overlooks the fact that as originally contemplated, the Debtor's Plan was to go effective long ago. Given the duration of these proceedings, it is not surprising to have seen the loan commitment expire, and it would be hasty to view it as a dead letter at this point.  Mr.

---

[27] As discussed, *infra*, the Debtor experienced strong results in June 2006, as well. (Ex. D-105)

Field, for example, testified credibly that he was still in discussions with Grand Pacific relative to this financing, which financing could present an attractive investment opportunity for a lender, given that the Outparcel, as noted, is the only development opportunity remaining in the La Guardia market.[28]

SunTrust concedes that the terms of the Bond documents permit the sale of the Outparcel and its release from the lien of the first mortgage. SunTrust argues, however, that the Bond documents prohibit sale of the Outparcel while the Bonds are in default. As the proceeds from sale of the Outparcel are needed to meet payment obligations on the effective date, SunTrust concludes that the sale cannot take place. The Debtor responds, however, that its Plan contemplates that the cure of the Bond default and the sale of the Outparcel will occur simultaneously. While the Plan could be clearer on this point, the Court agrees that a fair reading of it supports the Debtor's position.

Lastly, SunTrust observes that the portion of the proceeds required to be paid to SunTrust upon sale of the Outparcel is an as yet undetermined number. In this respect, the Bond documents

---

[28]   The Court recognizes that the expired Grand Pacific Loan Commitment provided for financing in the lesser amount of $3,500,000 or 63% of the value of the parcel. At the June 1,2006 CBRE value for the Outparcel of $5,300,000.00, the expired Grand Pacific loan would have generated roughly 3.4 million dollars. The Court does not view the difference as material, particularly given the likelihood that the Outparcel continues to appreciate.

provide that the amount is to be determined by the IDA's Bond counsel, provided that Bond counsel determines that release of the Outparcel will not impair the tax exempt status of the Bonds.

As the Bond documents specifically contemplate sale of the Outparcel and release of the mortgage, it is difficult to imagine that the tax exempt status of the Bonds would be jeopardized through such a sale.  (Indeed, at JFK an adjacent parcel was apparently sold without loss of tax exempt status). As to the release price, the Debtor's Plan projects that it will not exceed $1,000,000.  Mr. Eisenberg testified that this figure came from the IDA's Bond counsel about two years ago, and that he believed it was memorialized in writing.  SunTrust observes that no such writing was produced in these proceedings, however, neither does anything in the record rebut Mr. Eisenberg's testimony, and that is despite the fact that the relevant NYC Agencies were represented and participated throughout these proceedings.  On this score, the Court nevertheless notes that the NYC Agencies have filed objections to the LGA Plan which assert that the Debtor cannot sell the Outparcel because it cannot satisfy the conditions in the Lease required of it.  It seems clear that where matters related to both Debtors are concerned the NYC Agencies take direction from SunTrust.  It is fair to assume, therefore, that the NYC Agencies will not rush to cooperate with the Debtors vis a vis, sale of the Outparcel.  It is less clear

however, that they can prevent it.

As noted, the Lease specifically allows for sale of the
Outparcel.  The NYC Agencies argue that a sale is only allowed if
there is no existing event of default.  That is true, however,
the LGA Plan contemplates curing the defaults.  The NYC Agencies
also argue that the proposed sale for $3,500,000 to an insider
(i.e., a wholly owned subsidiary of the Debtor) violates the
provision of 11 U.S.C. §363(k).  This section of the Bankruptcy
Code allows a secured creditor to credit bid at a sale conducted
pursuant to §363(b).  It is inapposite for present purposes.

As to the sale of the Outparcel being made to an insider,
the Court notes that, after the sale, the stock of the new
company will belong to and be an asset of the Debtor.

The Debtor implies thereby that the excess value will remain
with the Debtor, and hence that the position of SunTrust will not
be adversely affected.  This is not quite correct.  The Outparcel
will cease to be part of SunTrust's collateral after the proposed
sale, and there is the possibility that the new entity could
expend the retained value.

To protect the interests of creditors, the Court will
therefore require as a condition to confirmation, 1) that any
transfer of the stock or other ownership interest be restricted,
and 2) that no distributions to ownership, or outside the
ordinary course of business be permissible until the LGA Bonds

88

are redeemed.  With that said, the Court does not perceive any
insuperable barriers to sale of the Outparcel as permitted under
the Bond documents and contemplated under the LGA Plan.

### (3) <u>Working Capital Loan</u>

SunTrust's initial challenge to this funding source is based
upon the Debtor's failure to have produced an irrevocable binding
commitment letter, or other hard and fast transactional
documents. While true, this is not fatal.  The Bond documents
specifically contemplate a working capital loan and Mr. Field has
demonstrated experience in procuring such financing in the past.
The Debtor provided a letter of intent with respect to the new
working capital loan from NexBank (Exhibit D-76) dated as
recently as March 27, 2006.  The letter expired in April 2006,
but just as with the contemplated Grand Pacific loan, the Court
views this in context.  The failure of the transaction to go
forward is, in other words, unquestionably tied to the almost
unheard of length of these proceedings.  The Court again sees in
SunTrust's argument a demand for a guarantee, which the
Bankruptcy Code, as noted, does not require of a debtor.

SunTrust's second argument as to the proposed working
capital loan with NexBank is that it is an impossibility, because
the express language of the Lease (M-66) prohibits LGA from
providing NexBank with the collateral called for in the letter of
interest.  Having examined the relevant documents, the Court

89

disagrees.

The NexBank letter of intent called for the following as collateral:

> **Collateral:** The proposed Loan will be secured by a first priority lien on, and a security interest in:
>
> - All of the accounts receivable of the Borrower
>
> - All of the Borrower's "Operating Revenues" as that term is defined in that certain Lease Agreement (the "Lease Agreement") dated as of September 1, 1998 by and between the New York City Industrial Development Agency and the Borrower, and
>
> - All of the outstanding equity interests of the Borrower

The Trust Indenture (M-66 at Appendix A, page 7) specifically provides for working capital loans to the extent permitted under the Lease. The Lease, meanwhile, at §6.19 specifically permits a working capital loan secured by the collateral described above. SunTrust's argument to the contrary (SunTrust Post-Trial Brief at page 68) is simply, indeed blatantly, wrong. Moreover, the Court must also reject SunTrust's argument that the proceeds of the working capital loan could not be used to pay Chapter 11 costs on the effective date. The proceeds of any working capital loan can be used to pay "senior operating expenses" as that term is defined in Article I of the Lease. (M-66 at page I-9) LGA correctly points out that

the definition includes "actual operational and maintenance expenses" and "reasonable administrative expenses of the lessee." The Court agree with LGA that this would cover the Debtor's Chapter 11 costs, which are by definition administrative expenses.

### (4)  **Sale of Rooftop Antenna Rights**

According to Mr. Eisenberg, many hotels and other commercial buildings rent space on their rooftops to companies such as Verizon, Cingular and T-Mobile, which then set up antennas on the space.  The Debtor apparently is doing this at the Crowne Plaza now.  There has apparently arisen a secondary market in which investors purchase the revenue stream anticipated over the term of the lease. (Presumably based on a discounted cash flow basis) Mr. Eisenberg described the secondary market as being particularly competitive right now due to the need for more antennas in denser markets, such as New York, and stated that he has received several proposals for purchase of the contracts at the Crowne Plaza.  (N.T. 3/27/2006 at 127-131).  The Court credits this testimony and finds this potential source of funds entirely plausible.

### (5)  **Partner Contribution**

The Plan, as noted, calls for a capital infusion of $500,000 to meet effective date payments.  In the grand scheme of things this is the smallest component of the individual cash sources,

91

and there is little doubt in the Court's mind that Mr. Field has
the means and the motive to generate this sum. Contrary to
SunTrust's assertion that "to date Field has not stepped up to
the plate to help these assets through their difficulties."
(SunTrust post trial brief at 71), it appears clear that Mr.
Field has already personally advanced close to $200,000.00 in the
two cases.  (N.T. 3/29/06 at 86-87) This by itself, demonstrates
an ability to make capital contributions.  Beyond this, there is
unrebutted evidence in the record that Mr. Field (age 76) holds
paid up whole life insurance policies, the sale of which would
yield approximately $4,000,000. (N.T. 3/29/06 at 81) The Court
will address this topic further when it takes up the question of
feasibility of the Debtor's Plan looking beyond the effective
date.  For present purposes, however, the Court concludes that
this component of the effective date sources of funds is
sufficiently reliable.

### (6)  Default Rate Interest and Attorneys Fees

#### (a)  <u>Default Rate Interest</u>

Crucial to the outcome of this case is the significance of
the LGA Bond's provision for default rate interest.

Section 506 of the Bankruptcy Code provides that a holder of
an oversecured claim is entitled to "interest on such claim, and
any reasonable fees, costs, or charges provided for under the
agreement under which such claim arose."  11 U.S.C. §506(b).  The

Supreme Court in *United States vs. Ron Pair Enterprises, Inc.,*
489 U.S. 235, 242, 109 S.Ct. 1026, 1031, 103 L.Ed.2d 290 (1989),
held that while an award of "fees, costs and other charges" is
dictated by the loan agreement, the award of interest is not.
The High Court did not elaborate, however, as to how the interest
rate in the agreement should be treated.

At least 3 distinct rules have been applied by courts in
dealing with post-bankruptcy default rate interest claims by
oversecured creditors.  One line of authority holds that the only
limitation on the oversecured creditor's right to default rate
interest is the enforceability of such right under applicable
non-bankruptcy law.  *See e.g., In re: K&J Properties, Inc.,* 338
B.R. 450, 460-61 (Bankr. D. Col. 2005)

A second line of authority takes the position that a claim
for default rate interest is not a claim for interest at all, but
rather a claim for a "charge," which, as noted above, must be
reasonable under §506(b).  *See: In re AE Hotel Venture*, 321 B.R.
209 (Bankr. N.D. Ill. 2005):

> Although interest is also sometimes charged
> to compensate for the risk of non-payment,
> *see Till v. SCS Credit Corp.,* 541 U.S. 465,
> 479-80, 124 S.Ct. 1951, 1961-62, 158 L.Ed.2d
> 787 (2004), default interest sought under
> section 506(b) performs no such function.
> Because a creditor claiming default interest
> under section 506(b) is oversecured, the
> creditor will be paid in full.  Arguably, in
> fact, default interest *never* compensates for
> any risk of nonpayment.  A "risk" is the
> possibility of experiencing some harm or

93

> loss.  *American Heritage Dictionary* 1557 (3rd
> ed.1992).  Once the harm comes about,
> however, there is no longer any "risk" of it.
> When a default interest rate comes into
> effect, there has already been non-payment.
> Indeed, non-payment is what makes the rate
> effective in the first place.  At that point,
> non-payment is not a "risk"; it is a reality.

321 B.R. at 215 n. 8.

A third line of authority reasons that the Bankruptcy Code

has the equitable power and duty to examine the circumstances of

the oversecured creditor in each particular case and consider

notions of fairness and equity in determining whether to award

default rate interest.  This appears to be the majority view.

*See In re Terry Limited Partnership*, 27 F.3d 241, 243 (7th Cir.

1994) ("what emerges from the post *Ron Pair* decisions is a

presumption in favor of the contract rate subject to rebuttal

based upon equitable considerations"); *In re Laymon*, 958 F.2d 72,

75 (5th Cir. 1992) (endorsing a flexible approach where the

higher default rate would produce an inequitable or

unconscionable result.)

This Court will adhere to the majority rule.  In doing so it

will deny SunTrust's request for the allowance of a default rate

interest.

At the outset, the Court notes that no evidence whatsoever

was offered during these proceedings as to the genesis of the

particular default interest rate at issue herein.  That

notwithstanding, the Court observes that a default interest rate

94

is commonly included in mortgage transactions to cover the
additional but unforeseeable costs associated with a defaulting
borrower. *Terry, supra,* at 244. Where this function is not
implicated there is the risk that a default rate may function as
a coercive penalty. Where that is the case many courts have held
that it would be inequitable to allow its impact to destroy a
Debtor's opportunity to reorganize. *See e.g., In re Dixon*, 228
B.R. 166, 175 (D. W.D. Va. 1998).

Other courts have emphasized a similar point, but from the
standpoint of other creditors. *See e.g., In re Process Property
Corp.*, 327 B.R. 603, 609 (Bankr. N.D. Tex. 2005) (The impact upon
other creditors is the most important issue in deciding whether a
default rate of interest should apply).

The Court in *Process Property* relied on the decision of the
5th Circuit Court of Appeals in *In re Southland*, 160 F.3d 1054
(5th Cir. 1998). In *Southland*, the Court followed the majority
rule in allowing a default rate of interest. The *Southland* Court
did not apply any particular balancing factors, but it did find
that the two percent default rate at issue therein was relatively
small, the secured creditor had not obstructed the confirmation
process, and no junior creditors would be harmed by the
application of the default rate. 160 F.3d at 1060.

SunTrust urges application of the majority rule in this
instance. It stresses, however, that the rule requires LGA to

95

prove that equitable considerations mandate disregard of the
Bondholders' contractual default rate.  (SunTrust post-trial
reply brief at 22) SunTrust insists that "given the lengthy and
pernicious defaults and the conduct of Martin Field, LGA cannot
meet this burden and has not even attempted to do so." *Id*.  The
Court disagrees with this conclusion.

At the outset, the Court notes that the default rate herein
does not serve the traditional purpose of compensating a lender
for the "additional but unforseen costs associated with a
defaulting borrower."  That point is self-evident, as the bonds
were in default when they changed hands in 2004.  Additional
costs associated with a default can scarcely be said to have been
unforeseen.  Such circumstances, the Court concludes, would
clearly have been factored into the purchase price in 2004, a
fact which no doubt contributed to sale of the bonds at roughly
73 cents on the dollar.  SunTrust witness, Jon R. Lind, from
Raymond James and Associates, Inc., (described more fully *infra*)
noted that acquisition of the bonds at that price produces a tax
exempt yield of approximately 8%, (N.T. 2/27/06 at 71), which is
a 33% increase over their coupon rate.  Allowing a default rate
of interest in this setting would unquestionably confer an
enormous windfall on the Bondholders.

Beyond this, the court notes the presence of certain other
equitable factors which bear on the question and which weigh

96

against allowance of the default rate.  First, unlike the
situation in *Southland*, where a 2% default rate escalation was
deemed to be relatively small, here it would represent an
increase in the contractual interest rate of 33⅓%, an increase
the Court does not view as small or nominal.  Moreover, if one
accepts Dr. Jones' conclusion (discussed *infra*) that the present
efficient market interest rate for the LGA Bonds is on the order
of 4.38%, a rise to 8% would, in fact, represent an almost 100%
increase.  Either scenario is penal.

   Another consideration, indeed that which is said to be the
most important, is the impact which allowance of the default
interest rate would have on other creditors. SunTrust estimates
that allowance of default rate interest would add approximately
$3,000,000 to the amount required to be paid to it on the
effective date.  SunTrust has already argued that the Debtor's
plan, which calls for a $13,000,000 payout on the effective date,
is infeasible because the payout cannot be made.  For the reasons
hereinbefore discussed, the Court disagrees.  If the number jumps
to $16,000,000, however, the Court would be constrained to agree.
In other words, the inclusion of default rate interest here would
foreclose the prospect of a reorganization and creditors junior
to SunTrust would be severely harmed.

   In sum, having examined the equities of the case, the Court
concludes that the totality of the facts and circumstances calls

for the denial of SunTrust's request for the allowance of interest at the default rate.

### (b)  Attorneys Fees

The Debtor concedes that SunTrust, as an oversecured creditor, would be entitled to the inclusion of some attorneys fees and costs as part of its allowed secured claim.  The Debtor, however, makes two responses to SunTrust's reliance on this fact in challenging the feasibility of the LGA Plan.  First, the Debtor argues that Section 506(b) does not provide for recovery by SunTrust of every dollar that it chooses to pay the attorneys representing it in connection with these proceedings.  In this respect, the Debtor contends that SunTrust has inappropriately chosen to litigate every conceivable issue in these proceedings, assuming that it had a "blank check" to do so  – at the Debtor's expense.  SunTrust maintains that its recoverable legal fees and costs approximate $1,500,000.  The Debtor argues that the "reasonableness" governor will ultimately result in the allowance of a lower number, because much of the fees and costs sought were incurred to advance SunTrust's alleged *sub rosa* agenda, which LGA describes as being nothing short of a "hostile takeover" of the hotel.

The Debtor also argues that the amount of allowable legal fees and costs is not a "confirmation issue," because SunTrust has not filed an application for fees and hence has provided no

98

evidence of the amount or the reasonableness thereof.

The Debtor is correct that SunTrust has not included fees and costs in the proof of claim on file.  SunTrust explains this by stating that it refrained from doing so in the interest of judicial economy, deciding to await the Court's decision on valuation before moving for allowance of fees and costs under §506(b).  (SunTrust post-trial brief at 22)

The Court finds merit in the Debtor's position.  In its evaluation of the default rate interest issue, the Court noted that a factor considered by at least one court (*Southland*) in its examination of the issue was whether the creditor in question had obstructed the confirmation process.  This Court stops short of characterizing SunTrust's conduct herein by that pejorative phrase, however the Court stresses that it does not stop well short of doing so, but rather just short of doing so.  There is much to be made of the Debtor's assertion that the scorched earth nature of these proceedings has been due to SunTrust's actions. The fact that SunTrust has advocated positions (*vis a vis*, LGA) which are so vastly different from the Debtor's (as discussed *supra* and to be discussed *infra*), coupled with the fact that this Court has found almost all of the main tenants of SunTrust's positions as to LGA to be flawed or otherwise lacking in merit, gives purchase to the Debtor's premise that SunTrust indeed had no goal herein other than to acquire ownership of the hotels.

99

The Court stops short of making that a finding herein, but notes that the particulars of any eventual Motion for allowance of attorneys fees and costs will warrant close scrutiny: which is to say that SunTrust will not be awarded fees and costs it voluntarily incurred in conducting a war of attrition.

That said, the Court concludes that the prospective award of attorneys fees and costs, in some indeterminate amount, is not an impediment to the feasibility of the Debtor's plan.

## 2.   **Feasibility of the LGA Plan Beyond its Effective Date**

The feasibility of the Debtor's Plan over the long term is another hotly contested issue.  As with other issues in the case it is multidimensional.  One critical dimension is the appropriate "cramdown" interest rate.  The Debtor's Plan calls for the interest rate on the LGA Bonds to remain the same for each series (i.e., 5.8% and 6.0% per annum).  The Plan also assumes that the Bonds will retain their tax exempt status.  On this score the Plan at ¶ 6.8 provides as follows:

**6.8   Preservation of Tax Exemption of Interest on the Bonds:**

(a)   Prior to the Effective Date, and as a condition to the Effective Date, the Debtor shall:

(i) request that the NYCIDA retain counsel at the Debtor's expense to analyze and render an opinion that the changes to the Bonds effected by the Plan do not alter the tax

exemption on interest payments under the
Bonds;

(ii) deposit with the NYCIDA an amount to be
payable to bond counsel to the NYCIDA,
sufficient to permit such counsel to
undertake an analysis and deliver the
opinion; and

(iii) either obtain such an opinion or a
comparable ruling from the Internal Revenue
Service.

The NYCIDA shall promptly engage such counsel and
request that counsel conduct the analysis and, if
possible, issue such opinion as expeditiously as
possible.

As of this date the Debtor has not obtained a tax opinion

from the IDA or the Internal Revenue Service.  The process

however is underway.  It would of course be preferable if it were

completed by now, however, for the reasons discussed *infra*, the

pendency of the matter is not an insuperable barrier to

confirmation of the LGA Plan.

LGA's projections of future profitability are premised on

the Court's approval of the contract rate as the appropriate

cramdown rate of interest.  A higher interest rate would have an

obvious impact on the Debtor's ability to meet its future

obligations.  Herein lies at least part of the rub.  SunTrust

predicts, that for a host of reasons, the Debtor will fail to

meet its obligations, even if the interest rate on the Bonds

remains unchanged.  More to the point, however, SunTrust

strenuously insists that use of the contract rate is

101

inappropriate and that a significantly higher cramdown rate of

interest is called for herein.   SunTrust argues, further, that

the tax exempt status of the Bonds is imperiled, that the IDA

Bond's counsel will never issue a favorable tax opinion, and that

the IRS "may likely" issue a ruling adverse to LGA.   The Court

will examine the parties' competing positions.

### a. <u>Cramdown Interest Rate</u>

The Court begins, of course, by noting the implication of

the decision of the United States Supreme Court in *Till vs SCS*

*Credit Corp.*, 541 U.S. 465, 124 S.Ct. 1951, 158 L.Ed.2d 787

(2004) (plurality opinion).   This Court has had prior occasion to

analyze the *Till* decision.   *See: In re Prussia Associates*, 322

B.R. 572, 585-589 (Bankr. E.D. Pa. 2005) In *Till*, (a Chapter 13

case)the Supreme Court analyzed the various methodologies courts

have traditionally employed in determining cramdown rates of

interest: those being the coerced loan rate, the presumptive

contract rate, the formula rate, and the cost of funds rate.

The Supreme Court evaluated each and observed that all but

the formula approach suffered serious flaws:

> These considerations lead us to reject the
> coerced loan, presumptive contract rate, and
> cost of funds approaches.   Each of these
> approaches is complicated, imposes
> significant evidentiary costs, and aims to
> make each individual creditor whole rather
> than to ensure the debtor's payments have the
> required present value.   For example, the
> coerced loan approach requires bankruptcy
> courts to consider evidence about the market

> for comparable loans to similar (though
> nonbankrupt) debtors--an inquiry far removed
> from such courts' usual task of evaluating
> debtors' financial circumstances and the
> feasibility of their debt adjustment plans.
> In addition, the approach overcompensates
> creditors because the market lending rate
> must be high enough to cover factors, like
> lenders' transaction costs and overall
> profits, that are no longer relevant in the
> context of court-administered and court-
> supervised cram down loans.

*Id.* at 477, 124 S.Ct. at 1961.

The plurality made clear its view that in Chapter 13 cases

the formula approach is the preferable method, but it was less

certain about its use in Chapter 11 cases.  The plurality

commented that it thought it likely that Congress intended

bankruptcy judges and trustees to follow essentially the same

approach when choosing an appropriate interest rate in Chapter 11

cases as in Chapter 13 cases.  However, in what is becoming an

increasingly famous footnote, the Court noted an important

distinction between Chapter 13 and Chapter 11 cases; to wit: that

there was no free market of willing cramdown lenders in Chapter

13 cases.  By contrast, it said the same could not be said of

Chapter 11 cases:

> [i]nterestingly, the same is not true in the
> Chapter 11 context, as numerous lenders
> advertise financing for Chapter 11 debtors in
> possession.  *Thus, when picking a cram down
> rate in a Chapter 11 case, it might make
> sense to ask what rate an efficient market
> would produce.*  In the Chapter 13 context, by
> contrast, the absence of any such market
> obligates courts to look to first principles

103

> and ask only what rate will fairly compensate
> a creditor for its exposure.

*Id.* n. 14

In *Prussia Associates*, this Court concluded that by virtue of *Till's* footnote 14, use of the formula approach was not mandated in all Chapter 11 cases, particularly where an efficient market existed.  322 B.R. at 589.  In *Prussia Associates,* the Court further concluded that an efficient market, in fact, existed in the hotel industry, however, the entirety of the evidence offered as to the interest rate that an efficient market would dictate was lacking in probative weight, such that adherence to the formula approach was appropriate.  322 B.R. at 590.

Since the issuance of the *Till* decision other Courts have concurred that *Till* is not dispositive in Chapter 11 cases, and there is no controlling authority in this Circuit to the contrary.  The Court will thus adhere to its position in *Prussia Associates* and evaluate the appropriate cramdown interest rate in similar fashion.

Just as in the case of valuation, the parties presented a sizable body of testimony from well qualified experts.  The Debtor's witness was Charles M. Jones, Ph.D, a tenured professor at the Graduate School of Business of Columbia University, and an expert in the area of markets for, and interest rates on, fixed income securities. (N.T. 11/21/05 at page 6; Exhibit D-46).

104

SunTrust's principal interest rate witness was Jon R. Lind, Jr., a Managing Director of Raymond James & Associates, Inc., and an expert in the area of the cost of capital and pricing of municipal bonds in the general finance market, with a special emphasis on high yield bond issues (N.T. 2/27/06 at page 15; Exhibit M-65).

Each witness was retained to estimate a current market rate of interest for the tax exempt LGA Bonds.  Perhaps predictably though, once again the opinions of two eminent authorities were, figuratively speaking, miles apart.  On this score, Dr. Jones opined that as of November 7, 2005 the market rate of interest was 4.38% per annum (D-46 at 2).  Mr. Lind, on the other hand, opined that as of February 17, 2006, the Bonds would have "a <u>minimum</u> cost of capital between 8.5% to 9% or possibly higher . . . "(emphasis in original, M-65 at 8).

Unlike the realty appraisals, where large discrete dollar differences could be identified, the explanation for the large differential between the interest rate experts views of a market interest rate lies in their having utilized two wholly different methodologies.

Dr. Jones observed at the outset that the ideal approach to arriving at a market interest rate in this case would be to identify and measure the yield on debt instruments that have the same characteristics, i.e., tax exemption, a similar maturity,

similar collateral, similar loan to value ratio, etc.  Dr. Jones

noted, however, that this particular type of bond, i.e., an

industrial development bond secured by real property, with triple

tax exemption, has not been issued since a 1986 change in the

U.S. tax laws.  This rendered a search for true comparables, in

his view, essentially futile.  Dr. Jones, accordingly, used a

broad-based index of taxable commercial mortgage rates to

identify the market rate of interest on a comparable tax exempt

bond, and then took into account an assumed economic value to an

investor of the bonds' tax exemption.

The data base Dr. Jones utilized was the Gilberto-Levy

Commercial Mortgage Performance Index.  It measures the returns

and yields on a model portfolio of over 11,000 institutional-

grade commercial mortgage whole loans.  It is reputed to be the

most extensive body of whole-loan commercial mortgage data

available anywhere.  Dr. Jones calculated the rate of interest as

of June 30, 2005, then made upward adjustments for the maturity

of the LGA Bonds, the specific type of realty collateral (a

hotel), and the increase in the benchmark interest rate (10 year

treasury note) over the passage of time.  Dr. Jones calculated

the taxable market rate of interest on the LGA Bonds to be 7.44%.

He then made a downward adjustment for the value of the Bonds'

tax exempt feature, based on an assumed income level and tax

bracket for a hypothetical New York City resident, and arrived at

106

a final interest rate of 4.38%.  To cross check his conclusion he
compared it to the yield, as of September 30, 2005, for the
Vanguard New York Long Term Tax-Exempt Fund. The yield on the
Vanguard Portfolio was 3.62%.  He concluded 1) that the lower
yield on the Vanguard Fund was due to the higher credit quality
of the portfolio, and 2) that the LGA Bonds market interest rate
was unlikely to be too far above the Vanguard rate due to the
fact that the existence of a mortgage on the hotel reduced the
expected magnitude of losses upon any default.

Mr. Lind described the Raymond James approach to the
analysis of any individual security as being "holistic."  In the
instant setting that translated into his performing 1) a credit
analysis of LGA based on "qualitative and quantitative factors,"
2) a comparable security analysis based on a search of a
municipal securities database containing "tens of thousands" of
securities and 3) a taxable benefit analysis.

Mr. Lind concluded that the Debtor's historic financial
performance would cause investors to require a relatively high
interest rate.  His comparable securities analysis produced an
average coupon rate of 7.314%.  Also, Mr. Lind opined that in his
experience the maximum (tax) benefit that would be attributed by
an investor to the bonds being triple tax exempt would be an
almost negligible 4% to 5%.

As with the appraisals the Court sees shortcomings in each

107

interest rate analysis, but finds Dr. Jones' testimony, overall, to be the more credible.

Mr. Lind's credit analysis places no weight whatsoever on what this Court has already found to be a dramatic improvement in the recent operating performance of the Crowne Plaza. Also, several of the negative qualitative and quantitative factors which Mr. Lind gave weight to were factors which were in existence when the LGA Bonds were refinanced in 1998 and were disclosed in the offering prospectus; yet they did not inhibit the sale of the Bonds to knowledgeable investors. Secondly, although Mr. Lind's comparable sales data base consisted of "tens of thousands" of securities, the average rate he computed was actually based on a subset of just 11 transactions.[29] Third, while the Court believes that Dr. Jones' tax benefit analysis may well overstate the precise benefit attributable to the Bonds' triple tax exempt status, the Court similarly finds that Mr. Lind's blanket dismissal of any meaningful benefit runs counter to common sense and most likely understates matters.

---

[29] The Debtor observes, correctly, that the eleven transaction upon which Mr. Lind relied included many which Douglas Hersher relied upon in connection with his testimony related to the value of the Crowne Plaza. In each case, the Debtor also observes that the transactions relied upon by the SunTrust experts were not triple tax exempt, had widely varying maturities and were issued between 1998 and 2003. In the opinion of Dr. Jones, these factors rendered the comparability of the transactions which underlay Mr. Lind's opinion suspect. The Court agrees, and adds that it has serious doubt that 11 transactions is a statistically valid sample set.

In sum, the Court finds Dr. Jones' opinion as to the efficient market rate of interest for the LGA Bonds to be the more accurate, even if it may be somewhat on the low side.  The latter point is academic, however, as the interest rate proposed under the Debtor's plan, and which the Court will approve, is a healthy 1.62% higher than Dr. Jones' estimated market rate.

The Court pauses here to note the Debtor's insistence that this entire line of inquiry is unnecessary, and that an analysis `a la *Till* is inappropriate, because LGA is curing and reinstating the Bond debt.  The Court disagrees.  LGA acknowledges that its plan does not leave SunTrust unimpaired.  LGA argues, nevertheless, that it is in essence "curing" the existing default by bringing the account current.  In a manner of speaking that may be viewed as a cure; but for present purposes it falls short.  The Debtor does not automatically enjoy the right to impose or retain the existing rate of interest on the Bonds absent a finding that SunTrust is unimpaired within the meaning of §1124.

Nevertheless, as noted, the Court concludes that the existing coupon rates of interest are an appropriate cramdown rate of interest in this case.  This conclusion flows from acceptance of the testimony of Dr. Jones as to a present efficient market interest rate, but discounting it (and hence raising the rate) for what the Court views as an overly generous

assessment on his part of the benefits of the Bonds' triple tax exemption.

Before moving past this, the Court again notes the Debtor's argument that if the LGA Plan is confirmed, the Bondholders will actually receive the benefit of a significantly higher yield because they purchased the Bonds at a discount.  This, of course, is a fair complaint.  Still, it has conversely been noted that an investor who purchases a distressed claim typically enjoys the same rights and disabilities as the original claimholder.  *In re Enron Corp., et al*, 340 B. R. 180, 202 n. 20(Bankr. S.D. N.Y. 2006).  The present Bondholders, in other words, are entitled to the same rights as their predecessors.  Such rights, of course, are not unfettered.  They include the right to a fair and equitable cramdown interest rate, but they do not, as previously discussed, include the right to a windfall.

On the latter score, and apropos cramdown interest rates in particular, the Court notes the cogent analysis in *In re American Homepatient, Inc.,* 420 F.3d 559, 568-569, (6th Cir. 2006) The lenders in *American Homepatient* made arguments virtually identical to those made by SunTrust herein; to wit: that the Bankruptcy Court should have taken "loan specific" criteria into account in adjusting the cramdown interest rate. *Id.* at 568.  In that respect, the lender in *American Homepatient* argued, as SunTrust does, that any new loan to the Debtor would

110

consist of senior secured debt, mezzanine level debt, and equity.

The Bankruptcy Court had rejected that argument noting that:

> The Lenders' argument that the debtor could
> not obtain a "new loan" in the market place
> so highly leveraged might be so, but in
> actuality no new loan is being made here at
> all.  Instead, the court is sanctioning the
> workout between the debtor and the Lenders.
> New funds are not being advanced without the
> consent of the claimants.

*Id.* at 568-69

The Bankruptcy Court further noted that the 12.6% interest

rate called for by Lenders would result in a windfall:

> The lenders are not entitled to a premium on
> their return because the debtor filed for
> bankruptcy.  The blended rate suggested by
> the Lenders goes beyond protecting the value
> of its claim from dilution caused by the
> delay in payment.... Any windfall because of
> bankruptcy is neither contemplated nor
> required under the Code. The court's role is
> not to reward the creditor for the "new loan"
> to a bankrupt debtor, but instead only to
> provide the creditor with the present value
> of its claim.

*Id.* at 569

The 6th Circuit noted that the *Till* plurality agreed that

Lenders should be compensated for their risk. *Id.*  However, on

this score the Supreme Court stated that a court considering a

cramdown rate is obligated "to select a rate high enough to

compensate the creditor for its risk but not so high as to doom

the Plan."  541 U.S. at 480, 124 S.Ct. at 1962.  The 6th Circuit

also noted that the *Till* plurality agreed that if a Bankruptcy

Court determined that the likelihood of default is so high as to necessitate an "eye popping" interest rate, the plan should probably not be confirmed. *Id.*  The interest rate SunTrust proposes falls into the "eye popping" category.  It would doom the Plan before it began, and it is wholly disproportionate to any risk the bondholders face given 1) the multimillion dollar paydown to be made to them on the effective date of the Plan, and 2) the substantial equity cushion in the property.

In sum, for all of the above reasons, the Court will approve an efficient market cramdown interest rate, which in this case it finds to be equivalent to the existing contract rate of the LGA Bonds.

### b.  The Tax Status of the LGA Bonds

The LGA Bonds, as hereinbefore discussed, were "triple tax exempt" upon the refunding which occurred in 1998.  (Ex D -71) The continuation of their tax exempt status has been called into question by SunTrust and its supporters, although SunTrust argues, as a threshold matter, that the question of the present status of the Bond is actually irrelevant, labeling the issue, in fact, a "red herring."  The Court has concluded that SunTrust is almost correct, albeit for a different reason.

SunTrust argues that consideration of the question is unnecessary because of the numerous other objections it has interposed to confirmation of the Debtor's plan.  These, it says,

112

foreclose any hope of a successful reorganization.  As will be seen, the Court has concluded otherwise.  The tax status of the Bonds is thus quite relevant.  Nevertheless, the question, however couched, might conceivably have been an academic one, because there in fact has never been a formal determination that the tax exempt status of the bonds has been lost.

The LGA Bonds remain tax exempt unless and until there has been a "determination of taxability."  This only occurs if one of three things happens.  They are described in the Appendix to the Trust Indenture, (Ex D-67 at A-3) as follows:

> Determination of Taxability shall mean
> (i) the filing by the Lessee or its
> representatives of a certificate with the
> Agency, the Trustee and any Bondholder
> stating an Event of Taxability has occurred,
> (ii) the receipt by the Lessee, the Trustee,
> the Agency or any Bondholder after proceeding
> for which the Lessee had notice and an
> opportunity to participate in a final
> determination from the Internal Revenue
> Service or a court of proper jurisdiction to
> the effect that an Event of Taxability had
> occurred, or (iii) the receipt by any
> Bondholder or former Bondholder of an opinion
> of Nationally Recognized Bond Counsel to the
> effect that an Event of Taxability had
> occurred.

The long and short of it is that none of the above three events has obtained.  Thus, it certainly cannot be definitively said that the LGA Bonds have lost their tax exempt status. Technically speaking, therefore, an extended discussion of the issue might indeed be unwarranted.

113

The question, however, loses its benign character because, as previously noted, LGA has made obtaining a favorable tax opinion from either the IDA's Bond counsel or the Internal Revenue Service a condition to its plan. The IDA's Bond counsel has made clear that it will not issue an opinion, one way or the other, but it has expressed concerns that the IRS, from whom the Debtor is in the process of seeking an opinion, will issue an unfavorable one.  As the economic consequences of the Plan upon SunTrust and others have been determined by the Court based on an assumption that the Bonds are and will remain tax exempt, fairness makes it necessary and appropriate for the Court to examine the parties' competing positions.

The issues germane to the tax issue have changed over time. There were a number of issues which had to do with the terms of the Debtor's second amended plan of reorganization.  These are described and discussed in a February 6, 2006 "Memorandum" from the IDA's bond counsel, Hawkins, Delafield & Wood, LLP ("Hawkins") (M-63) Most, but not all, of the issues raised by Hawkins in its February 2006 memorandum were mooted after the Debtor filed a third amended plan which addressed and corrected the problems Hawkins had noted.

One important issue which lingers, however, has to do with the Debt Service Reserve Fund ("DSRF") required to be maintained under the terms of the Trust Indenture.  The Indenture calls for

114

the establishment of a DSRF in the amount of $4,701,900.  It was
to be, and was in fact, initially established with a deposit of
$1,435,530 on October 7, 1998, the date of the issuance of the
1998 Bonds.  The fund was to be brought up to the fully funded
level through monthly deposits of $49,500.00 beginning in the
year 2000.  Some periodic payments were made to the DSRF, but
none were made after August 2001.  Beginning in May 2002, the
predecessor Indenture Trustee to SunTrust began to draw on the
DSRF to pay semi-annual debt service, and by April 2004, the DSRF
was fully depleted.

In its February 2006 Memorandum Hawkins expressed concern
that the use of the DSRF as described above may have caused the
1998 Bonds to lose their tax exempt status.  Hawkin's specific
concern is that because the monies in the DSRF were "allocated on
a long term basis to the payment of operating costs of the
facility in the form of debt service payments on the 1998 Bonds,"
relevant tax regulations may have been violated, which in turn
could cause, or may have already caused, the loss of tax exempt
status.

The Debtor, in the first instance, stresses that the Hawkins
memorandum (to the IDA) is <u>not</u> a tax opinion, let alone a
determination of taxability.  Apart from this, the Debtors
offered the testimony and report (D-72) of Robert S. Price,
Esquire.  Mr. Price is a well qualified expert in the tax aspects

of municipal bonds.  Mr. Price reviewed the relevant tax regulations and concluded, as had Hawkins, that the 1998 Bond issuance was certainly tax exempt.[30]  Mr. Price also noted that Hawkin's concern regarding depletion of the DSRF was predicated on a 1989 private letter ruling (#8952018) with a clearly distinguishable fact pattern.  The 1989 situation also involved an exempt facility in reorganization.  However, unlike here, the Debtor there proposed to use the proceeds in its DSRF to pay operating expenses such as utilities, insurance, taxes, etc., as opposed to using it for debt service payments.  Despite this, the Debtor also apparently proposed to allocate the payments from the DSRF ratably between qualifying and non-qualifying uses, because to do otherwise would apparently have caused it to fail the 90% qualified use requirement for tax exemption.

Mr. Price stated that he is unaware of any IRS regulation or private letter ruling which in any way suggests that the use of the monies in a DSRF to pay debt service, on a short or long term basis, is problematic, and that in his opinion the use of the LGA DSRF as described would not and has not caused the Bonds to become taxable.  (N.T. 3/27/06 at 70, 79)

---

[30] Indeed, Mr. Price notes that, in connection with the 1998 Bond issuance, Hawkins issued what is referred to in the industry as a clean opinion, which made no reference to the Borrower's ability to use the DSRF to pay debt service as a risk factor to the Bonds' tax exempt status.

The Debtor argues that Mr. Price's expert opinion should carry more weight than Hawkin's expression of concern.  The Court agrees.  If SunTrust or the IDA were to have produced an "opinion" from Hawkins that constituted a determination of taxability, matters naturally would be quite different; but that has not occurred.

In the opinion of the Court, the speculations of the Hawkins memorandum do not outweigh an independent, persuasive opinion on this issue from a highly qualified expert.  Accordingly, the Court finds the preponderance of the evidence to indicate that the LGA Bonds at this juncture are tax exempt and that the Debtor is more likely than not to receive a favorable ruling from the IRS on this point.[31]

A second possible remaining tax issue (raised only by the Debtor) has to do with the replenishment of the DSRF.  The Debtor's Plan calls for a deposit into the fund on the effective date of $1,435,000.00, which is the same amount that was initially deposited into the fund in 1998.  The Debtor proposes to thereafter bring the DSRF back to the required fully funded level ($4,701,900) on the same terms as called for in the Bond

---

[31] The Court notes that Hawkins prepared a second memorandum dated March 24, 2006 in response to the Price report which is appended to the objection to the Debtor's Plan filed by the IDA, et al.  The Debtor argues, correctly, that it is a hearsay document which is not properly a part of the evidentiary record.  The Court has disregarded it.

117

Indenture.  (i.e., monthly deposits of $49,500)

On this issue the Debtor offered the testimony of Marc
Feller, Esquire.  Mr. Feller is an expert in the tax aspects of
municipal bond transaction.  He is also a partner in the law firm
of Dilworth Paxson, LLP, counsel for LGA.  SunTrust interposed an
objection to admission of any testimony from Mr. Feller on the
basis of a conflict of interest.  The Court overruled this
objection on the basis that Mr. Feller's affiliation with the
Dilworth firm did not constitute a per se basis for his
disqualification, but did add that it obviously was a factor to
be considered in assigning weight to his testimony.  Had this
been a hotly contested issue, it might have merited lengthier
discussion.  As it is, however, neither SunTrust, nor its
supporters, weighed in specifically on this issue.  Mr. Feller
opined that he would feel very, very comfortable giving a clean
opinion that nothing in the Debtor's third amended plan
(including therefore the proposed terms for replenishing the
DSRF) would cause a "re-issuance" of the 1998 LGA Bonds.  (i.e.,
cause them to lose their tax exempt status) As this testimony is
unrebutted, and as the issue does not appear to be seriously
controverted, the Court will simply note that it finds Mr.
Feller's unrebutted testimony to be credible, and that it does
not find the DSRF replenishment terms to imperil the LGA Bonds
tax exempt status.

### c.   Viability of the Crowne Plaza's Operations Going Forward

The Court returns to the question of plan feasibility against the backdrop of the conclusions reached above; to wit: that the appropriate cramdown interest rate is the coupon rate of the LGA Bonds, and that the bonds are tax exempt and likely to remain so. As noted, SunTrust argues that irrespective of such findings the Debtor's plan is infeasible, *inter alia*, because the Debtor will likely fail to meet its future projections.  For numerous reasons, the Court disagrees.

The Court has previously commented on the fact that the Debtor's year to date financial performance has been particularly strong. (See Ex D-103) The Court notes, furthermore, that according to the latest reports in the evidentiary record published by the leading independent monitor of performance in the hotel industry (Smith Travel Research) the Crowne Plaza outperformed the market (i.e., its competitive set) by fairly healthy percentages in a variety of categories (Ex D-86 & D-87; N.T. 6/20/06 at 45-48; 49-53).

The Court likewise notes that, as of the conclusion of these proceedings, it is undisputed that the Debtor was moving into the strongest part of the hotel industry's annual business cycle (N.T. 6/20/06 at 62).  Accordingly, and other things being equal, the Court finds that the Debtor has clearly presented evidence

119

adequate to satisfy the feasibility requirement of 11 U.S.C.
§1129(a)(11).[32]  An aspect of the question which nevertheless
warrants some additional attention are the allegations made
herein, of historic fraud, waste, and mismanagement on the part
of Mr. Field and New Penn.  As previously noted, SunTrust's
arguments in this respect flow primarily from the contents of the
AMEX, ESBA and Platinum Reports, and from the report prepared by
Jonathan Nehmer & Associates.  For present purposes, the issue is
really twofold; the first part going to the condition of the
hotel, and the second involving allegations of improper inter-
company transactions.

The condition of the hotel impacts feasibility in the sense
that a hotel in a deteriorated state can be a reflection of poor
management.  The ability of the Debtor's management, where no
replacement is contemplated, is an appropriate factor to consider
for purposes of §1129(a)(11).  On this score, SunTrust argues
that the hotel is in exceedingly poor condition and that this is
due to poor management by New Penn.

As previously noted, the evidence offered on the issue of
the condition of the hotel was highly contradictory.  In response
to the reports upon which SunTrust relies, the Debtor offered the

---

[32]  The Court also adds on this score that the argument that Mr.
Field will be unwilling or unable to come forward with capital
contributions in the event of a shortfall is obviously lessened to a
degree by the Court's ruling (discussed *infra*) in the FHA case.

testimony of Mr. Field, Mr. Eisenberg, and Mr. Lesser, along with
the testimony and report of Dominick Accurso, a licensed
architect with the firm of Eckland Consultants, and an expert in
the area of architecture with an emphasis on real property
assessment reports.[33]  Leaving aside the Debtor's rebuttal
evidence, the Court has considered the evidence proffered by
SunTrust and found serious problems with it.

### (1) **The Nehmer Report**

As previously noted, the Court found the testimony and
report of Johnathan Nehmer to be very inconsistent.  To elaborate
on this, Mr. Nehmer espoused the extraordinary opinion that, with
the possible exception of the toilets, absolutely _everything_ in
the hotel had to be replaced.  Yet, in his written report, Mr.
Nehmer specifically identified numerous areas of the hotel which
were in good to very good condition, or which were in need of
only minor repairs.  These included the exterior doors, the main
entrance, the lobby and registration area, the restaurant, the
management and administrative offices, the laundry facilities,
the kitchen, the corridors, the guestroom bathrooms, and the
health club/indoor pool.  No attempt was made to reconcile the
glaring and pervasive inconsistencies between Mr. Nehmer's
testimony and his firm's report.  The Court consequently gives

---

[33]  The Debtor, as noted, also introduced an extensive set of
convincing photographs in support of its position.

relatively little weight to either.[34]

## (2) **The Platinum Report**

Michael Metcalf testified for SunTrust on behalf of
Platinum.  The Platinum report is far more critical of FHA than
LGA.  As to the Crowne Plaza, the report, as noted, is in many
respects complimentary.  Moreover, in certain areas where it is
critical, it, like the Nehmer report, was somewhat inconsistent.
Mr. Metcalf, for example, testified that profitability at the
Crowne Plaza was falling, yet he was forced to concede on cross-
examination that it was not and that his assertion to the
contrary was false. (N.T. 6/20/06 at 82) Furthermore, despite his
criticisms of management, Mr. Metcalf acknowledged that the
Crowne Plaza had outperformed its competitive set in every year
at which he looked.  *Id.* at 78.  In fact, Mr. Metcalf ultimately
acknowledged that the Crowne Plaza had a "very good management
team." *Id.* at 82.

_____

[34] The Court takes note of the emphasis that Mr. Nehmer places on the
Debtor's lack of adherence to the replacement guidelines promulgated by
Holiday Inn.  SunTrust also notes this and stresses, as well the history
of default notices which the Debtor has received from Holiday Inn under
the parties' franchise agreement.  This is not an insignificant issue,
but as with so many other issues, the import of it is overstated by
SunTrust, and here, by Mr. Nehmer.  The furniture and case goods at the
Crowne Plaza, for example, were shown to be of higher quality than
Holiday Inn standards call for (e.g., real wood vs. laminate).  Thus,
refurbishment rather than replacement might be appropriate.  Further,
while the relationship between the Debtor and Holiday Inn has seen its
ups and downs, the fact remains that, at present, the franchise agreement
remains in effect and Holiday Inn has, in fact, voted in favor of the
plan.

It will not be necessary to review the Debtor's opposing evidence as to the condition of the hotel or the ability of LGA's management, 1) since the evidence offered by SunTrust fails by far to establish its premises on either account, and 2) because the Court has already determined that the photographic evidence offered by the Debtor belies the assertions that the hotel is in deplorable condition.   The Court will turn therefore to the allegations of financial irregularities.

The evidence offered by SunTrust on this issue consisted of 1) the AMEX Reports and the testimony of Scott Peltz, and 2) the ESBA report and the testimony of Kenneth Neil.  At the outset the Court observes that the question of financial irregularities has formally been joined in separate litigation pending in this Court.  In this respect, the Court by Order dated September 20, 2005, granted SunTrust and Brickman Airport Transportation derivative standing on behalf of the LGA bankruptcy estate to sue Mr. Field, New Penn and other Field related entities for monies they allege are owed to LGA.  Adversary actions to this end are pending.[35]  As previously noted, Mr. Field, *et al*, vigorously deny the charges leveled at them.  The purpose of the present

---

[35] *Field Hotel Associates, L.P., and LaGuardia Associates, L.P., both through SunTrust Bank, Successor Indenture Trustee and duly authorized derivative representative vs. Martin Field, New-Penn Management Co., Inc., Guest Transportation Services, Inc., LaGuardia Express, LLC, LaGuardia, Inc., Field Kennedy Associates, Inc.* - Adversary Docket No. 05-733. See also: Advs. No. 05-725; Advs. No. 05-726

123

inquiry is not to resolve the allegations of impropriety, but to assess whether from the reports and testimony alone, there is reason to deny confirmation of the LGA Plan based on the Debtor's failure to satisfy the good faith requirement of §1129(a)(3) and/or the feasibility requirement of §1129(a)(11).  The Court concludes for several reasons, that there is no cause to do so.

The Court notes first that both AMEX Reports expressly state that they are "tentative and preliminary drafts subject to change" and were prepared, "for settlement purposes only."  This obviously lessens their probative weight.  Second, the Court notes that the transactions in question date back to 2001 and 2002. In this regard, the June 2005 AMEX report states "that since May 2003 management has eliminated excessive funding to its affiliates . . ."  (Ex M-51 at page 4).  Third, of the amounts at issue, the vast majority appear to involve the FHA Debtor rather than LGA.  (Ex M-2 at attachment E) Finally, as the Court will elaborate on, serious deficiencies in the work of both AMEX and ESBA were also brought out on cross-examination of their representatives.

### (3) **AMEX Reports**

The AMEX Reports were authored by Scott Peltz, a managing director of RSM Gladrey (a national accounting firm acquired by AMEX) and head of its litigation services group.  He was qualified by the Court as an expert in forensic accounting

124

with a speciality in the insolvency and distressed debt area.
Mr. Peltz, *inter alia*, performed a retrospective solvency
analysis of LGA for years 1998 forward.  Of note, Mr. Peltz
opined that in 1998, the same year in which a large national
investment bank underwrote the $50,000,000 LGA Bond issuance, LGA
was actually insolvent and that its liabilities exceeded its
assets by over $22,000,000!  (N.T. 11/22/05 at 57).

In this respect, Mr. Peltz estimated LGA's long term debt in
1998 at $68,000,000.  When questioned as to the make-up of this
debt, beyond the LGA Bonds, Mr. Peltz could not explain it.
Conversely, on the asset side of the balance sheet, Mr. Peltz
concluded that in 1998 the Crowne Plaza was worth $43,000,000.
Yet, that very same year HVS had valued the Crowne Plaza
(interestingly, on an assumption of debt basis) at $60,400,000.
When questioned as to the large difference Mr. Peltz again had no
explanation whatsoever, and even went so far as to state that the
vastly higher 1998 HVS appraisal, done that very same year, was
irrelevant to his own 1998 valuation analysis.  (*Id.* at 98)

In the opinion of the Court, Mr. Peltz's testimony was so
astonishing as to have eviscerated any reliance that might
reasonably be placed on the reports he prepared, at least for
present purposes.

### (4) **The ESBA Report**

The ESBA report does not stand up much better.  In making

its assessments ESBA relied to a significant extent on the AMEX

Reports.  For the reasons discussed above, and to borrow a

baseball metaphor, this meant that ESBA came to bat already

behind in the count.  The ESBA report also is somewhat difficult

to follow, in that much (but not all) of its discussion collapses

the financial affairs of the two hotels.  It is fair to say that

the ESBA Report expresses concern, *inter alia*, about improper

subsidies to affiliates, excessive management fees and

inequitable allocation of various revenues and expenses.  The

Court likewise makes note that ESBA believes that there is cause

to pursue fraudulent conveyance actions seeking the disgorgement

of funds transferred to non-debtor affiliates.  (M-2 at 21)

Such litigation, as noted, has been instituted, and in it

the chips, as they say, will fall where they may.  The Court does

not take the allegations lightly, nor should its conclusions

herein be viewed by any means as an exoneration of any who are

implicated.  By the same token, however, just as with the Nehmer,

AMEX and Platinum reports, shortcomings in the ESBA report were

replete, making conclusive findings for or adverse to the Debtor

premature.

As between the Holiday Inn and the adjacent Hampton Inn, for

example, Mr. Neil of ESBA opined that the Holiday Inn was bearing

more than its fair share of certain joint expenses.  It was

shown, however, that not only had Mr. Neil done nothing to

126

independently verify his statements (relying instead on the AMEX
Reports), but the conclusions he postulated were in many
instances clearly wrong.  This was true, for example, with
respect to the restaurant, the elevator and advertising.  Most
damaging though, was Mr. Neil's statement that he could not
identify "any significant example of a transaction between one of
the Debtors and a non-debtor affiliate which did not solely
benefit the non-debtor affiliate at the expense of the Debtor."
(Ex M-2 at 5-6)  Upon cross-examination this categorical
statement was shown to be patently wrong in several respects.
Mr. Neil, in fact, was forced to concede that he had "overlooked"
that Mr. Field had advanced $3,600,000 to LGA for construction
and operating costs, but had forgiven the debt in 1999. (N.T.
6/23/05 at 145-46; N.T. 10/27/05 at 96-97)

In short, Mr. Neil's work seemed quite careless.  The
probative weight of his report suffered commensurately.

The upshot of all of this is not, as noted, to decide the
issues raised in the adversary proceedings.  Rather, the Court
draws only the conclusion that nothing in the above-described
reports supports a finding that denial of the LGA reorganization
plan is warranted for failure to satisfy the requirements of
Bankruptcy Code §1129(a)(3) and/or (a)(11).

D. **Confirmation of the LGA Reorganization Plan Under
§1129(b)**

As previously noted, §1129(b) of the Bankruptcy Code
provides that if all of the requirements of §1129(a) are met,
save for subsection (a)(8), the Court shall nevertheless confirm
the plan if it does not discriminate unfairly and is fair and
equitable to each class of claims or interests that is impaired
under and has not accepted the plan.  The Code elaborates on
this, as follows:

> For the purpose of this subsection, the condition
> that a plan be fair and equitable with respect to
> a class includes the following requirements:
>
> (A) With respect to a class of secured claims, the
> plan provides-
>
> (i)(I) that the holders of such claims retain the
> liens securing such claims, whether the property
> subject to such liens is retained by the debtor or
> transferred to another entity, to the extent of the
> allowed amount of such claims;  and
>
> (II) that each holder of a claim of such class
> receive on account of such claim deferred cash
> payments totaling at least the allowed amount of
> such claim, of a value, as of the effective date
> of the plan, of at least the value of such
> holder's interest in the estate's interest in
> such property;
>
> (ii) for the sale, subject to section 363(k) of this
> title, of any property that is subject to the liens
> securing such claims, free and clear of such liens,
> with such liens to attach to the proceeds of such
> sale, and the treatment of such liens on proceeds
> under clause (i) or (iii) of this subparagraph;  or
>
> (iii) for the realization by such holders of the
> indubitable equivalent of such claims.
>
> (B) With respect to a class of unsecured claims--

128

(i) the plan provides that each holder of a claim
of such class receive or retain on account of
such claim property of a value, as of the
effective date of the plan, equal to the allowed
amount of such claim;  or

(ii) the holder of any claim or interest that is
junior to the claims of such class will not
receive or retain under the plan on account of
such junior claim or interest any property,
except that in a case in which the debtor is an
individual, the debtor may retain property
included in the estate under section 1115,
subject to the requirements of subsection (a)(14)
of this section.

(C) With respect to a class of interests--

(i) the plan provides that each holder of an
interest of such class receive or retain on
account of such interest property of a value, as
of the effective date of the plan, equal to the
greatest of the allowed amount of any fixed
liquidation preference to which such holder is
entitled, any fixed redemption price to which
such holder is entitled, or the value of such
interest;  or

(ii) the holder of any interest that is junior to
the interests of such class will not receive or
retain under the plan on account of such junior
interest any property.

11 U.S.C. §1129(b)(2)

The Court has determined that the LGA Plan meets all of the

§1129(a) requirements other than subsection (a)(8), thus

consideration of the Plan under §1129(b) is warranted.

The classes impaired under the LGA Plan and the treatment

proposed for them have heretofore been described.  Before

addressing the claim of SunTrust the Court will consider the

treatment of the three other impaired non-accepting classes.

Class 2 (priority tax claims in the estimated amount of

$200,000) rejected the Plan.  The Debtor proposes that, unless

the tax claimant elects an alternative all cash option, it will

be paid in two installments of 50% each, the first to be made on

the effective date of the Plan and the other to be made, with

interest at the statutory rate set in the New York City

Administrative Code, on the first anniversary of the Plan.  The

Debtor contends that this treatment meets the fair and equitable

test because the claims will be paid in full.  Clearly, however,

it fails the test, which requires full payment of the allowed

amount of the claim on the effective date, before payments to

junior classes or retention of interests.  The Debtor's plan will

have to be amended to rectify this problem.

The Debtor argues that the proposed treatment of classes 6

and 7 satisfies the fair and equitable standard as each creditor

will retain its liens and be paid in full under the Plan.  The

Court agrees as to Class 7, but disagrees as to Class 6, because

the Plan calls for pre-petition arrears on the secured Class 6

claim to be paid over time (albeit a short time, i.e., one year)

without interest.  This treatment does not satisfy

1129(b)(2)(A)(i)(II).  The Plan will have to be amended to

rectify this problem.

The Court turns next to the claim of SunTrust.

The Plan, as noted, provides that SunTrust will retain its

liens and that the account will be brought current as of the

130

effective date. The Court agrees with the Debtor that this treatment satisfies the requirements of §1129(b)(2)(A)(i)(I) and (II).  This is based on the Court's conclusion as to the appropriate cramdown rate of interest, as hereinbefore discussed.

The Court notes that the proposed sale of the Outparcel implicates the provisions of §1129(b)(2)(A)(ii).  SunTrust is to receive the entirety of the proceeds of the sale, and that portion of the purchase price required to preserve the tax exempt status of the Bonds is to be applied upon transfer to SunTrust towards the redemption of a commensurate amount of the outstanding bonds.  This comports with the requirements of the subsection.  The Court notes, however, that the City agencies, presumably focusing on the reference in the statute to 11 U.S.C. §363(k), have concluded that an auction sale of the Outparcel is mandated.  SunTrust has not raised this issue, presumably because it believes the Outparcel has no independent value.  The Debtor, likewise, has not addressed the issue.  The Court finds the position of the City Agencies unpersuasive.  As previously noted, §363(k) deals with pre-confirmation sales under subsection (b) of §363, and the right of a secured creditor to credit bid in that context.  The Court views the reference to this section as inapposite for present purposes, particularly given that the bond documents expressly provide for total release of the Outparcel from the lien of the Agency Mortgage upon payment of an amount to

131

be fixed by the IDA's Bond counsel or the IRS.

The Court thus concludes that, other things being equal, and subject to the amendments described herein, the LGA plan is confirmable under §1129(b).  The Court recognizes, however, that the provisions of §1129(b)(2)(A) are not exhaustive.  As a matter of general statutory construction, the Bankruptcy Code provides that the word "includes . . . [is] not limiting."  11 U.S.C. §102(3); *see generally* 7 COLLIER ON BANKRUPTCY ¶ 1129.04[b](Matthew Bender 15th Ed. Revised 2000)(stating that 1129(b)(2) contains but possible examples of what may constitute fair and equitable treatment).  Paragraph (b)(1), therefore, exists independent of the instances of what might constitute unjust treatment under Paragraph (b)(2).  There are other ways in which plan provisions may be so unjust as to a dissenting creditor as to require denial of confirmation.  In this regard, SunTrust raises concerns which the Court will address.

Most of SunTrust's issues the Court has already addressed.  Specifically, SunTrust argues that the plan does not satisfy §1129(b) because of the proposed cramdown interest rate.  The Court has previously rejected this contention.  SunTrust also argues that the Plan is not fair and equitable because of the alleged improprieties of Mr. Field, et al.  As noted, the Court will not prejudge the issues given the pendency of the adversary proceedings.  SunTrust has also argued that the Plan violates the

132

absolute priority rule, and hence is unconfirmable, because
SunTrust will have an unsecured deficiency claim that must be
paid before interest holders retain their interests.  This
argument fails, as the Court has found SunTrust to be over-
secured.  Finally, SunTrust argues that the Plan has not been
"proposed in good faith and by any means not forbidden by law."
On this score SunTrust relies on the Designation Motion.  The
Court, however, has found that Motion to have no merit, and
accordingly dismisses this challenge to the Plan.

Beyond the above, SunTrust makes two arguments not
heretofore directly addressed.  First, SunTrust argues that the
Plan is unconfirmable due to the inclusion of non-debtor release
provisions.  This issue can be laid to rest quickly.  The
provisions in question appeared in earlier iterations of the LGA
Plan.  They are not present in the plan now before the Court.

Second, SunTrust argues that the plan is unconfirmable
because it "shifts all of the risk of plan failure to SunTrust."
The Court rejects this argument.  SunTrust's argument as to the
risks attendant to the Debtor's plan failing are, in the main,
simply a repetition of arguments already made by it in other
contexts.  That is to say that SunTrust generally reiterates its
views as to flawed projections, feasibility, development of the
Outparcel, etc.

Most of these arguments have already been considered by the

133

Court and rejected, which is to say that the Court determined
that the Debtor has the wherewithal to make distributions called
for on the effective date of the plan, as well as the ability to
make the post-effective date payments the plan calls for over
time.  In this respect, SunTrust's arguments proceed from an
assumption that it is under-secured, that its proof of claim is
significantly understated, and that the Debtor's cash flow
demands will be higher than expected due to higher interest
payments. The Court has found, however, 1) that there is equity
in the realty several million dollars in excess of SunTrust's
claim, particularly after the large payment to be made to
SunTrust on the effective date, 2) that SunTrust's claim will not
be increased by default rate interest, and 3) that the interest
rate on the bonds will stay the same.  As a consequence, the
risks SunTrust hypothesizes are thus greatly exaggerated.

    In fact, the Court suspects that SunTrust's arguments are
disingenuous.  It is clear, in other words, that the Bondholders
are adequately protected, and the likelihood is that they will be
paid in full.  If the Plan fails in the near term, as SunTrust
predicts, SunTrust will in all likelihood foreclose on the hotel,
whereupon it will presumably resell it in what everyone agrees is
a white hot market, and the Bondholders will no doubt reap a
profit.  Alternatively, if the Debtor successfully implements its
plan, the LGA Bonds will be repaid in accordance with their

134

terms.  There appears, in essence, to be small risk in either scenario. However, as the former scenario is apt to be more lucrative to the Bondholders, it is logical that they would prefer it.  At the risk of putting too fine a point on this, rather than fearing the prospect that the plan will fail, the Court suspects that the Bondholders, in fact, might welcome it. In any event, the Court rejects this challenge to confirmation of the plan.

That said, the Court will nevertheless require, in the interest of fairness, one additional amendment to the plan.  The plan at present provides for affiliate unsecured creditors to receive a cash flow note on the effective date, which will accrue interest, but upon which no payments may be made until the later of (i) payment in full of all claims in classes 2, 5 and 6, or (ii) payment of 2 unmatured sinking fund installments, provided, however, that no payments may be made to this class unless the reorganized partnership is current in required deposits to the DSRF and the capital reserve fund.

Under the Plan, the former of the above two events will obtain no later than the first anniversary of the effective date. Deposits to the sinking fund account are required to be made beginning on October 1, 2006.  As a consequence, payments to affiliate unsecured creditors under the cash flow note could occur fairly soon.

As even Mr. Lesser agrees, the Debtor will require a period of years to achieve economic stabilization.  In view of this, the Court considers the terms of the Debtor's plan, vis a vis, the affiliate creditors, to be unfair.  The Court will therefore require that the plan be amended to provide that, in all events, there shall be no payments made to class 11 claimants prior to the fourth anniversary of the effective date.[36]

**E.    Summary.**

The LGA Third Amended Plan satisfies the requirements of §1129(a), with the exception of subsection (a)(8).  Confirmation of the Plan accordingly requires compliance with the provisions of §1129(b).  The Court has concluded that the Plan is confirmable under the cramdown section of the Code provided it is amended in certain respects, as follows:

> 1)    The corporate charter, or partnership agreement, of the entity to be formed to take title to the Outparcel must expressly provide that no transfer of an ownership interest is permitted until the LGA Bond debt is repaid.  Also, the operative document must provide that there can be no distributions to Ownership and/or outside the ordinary course of business (the latter of which

---

[36] By this point in time both HVS and CBRE agree the Debtor will have achieved stabilization.

may however include the development of the
proposed Hampton Inn) prior to payment of the LGA
Bond debt.

2)     The treatment proposed for Class 2 (priority tax
claims) and Class 6 (secured lease claim) must be
altered to remedy violation of the absolute
priority rule.

3)     The Plan must be amended to provide that there
will be no distributions to Class 11 (affiliated
unsecured claims) prior to the fourth anniversary
of the effective date.

Subject to the Plan being amended as aforesaid, and subject
to the affirmative vote of Class 11 creditors (the only class
whose treatment would be less favorable than presently proposed,
and whose "re-acceptance" is thus necessary), the Court will
confirm the LGA Third Amended Plan.

The Order accompanying this opinion will provide the Debtor
with a period of two weeks from the date thereof to take the
steps outlined above, and a hearing will be held one week
thereafter to ascertain the status of the case.

IV.    **FHA**

A.     **Approval of the FHA Disclosure Statement**

As observed much earlier in this opinion there are a great
many similarities between the LGA and FHA cases.  The factors

137

which precipitated the respective bankruptcy filings, for
example, were largely identical, and these have already been
discussed.

Other things being equal a great deal could thus be said
about the FHA case.  The circumstances of the FHA case, however,
are in certain respects critically different.  Accordingly, while
much could be said about the FHA case, comparatively little needs
to be said.

Procedurally, the FHA case is in a decidedly different
posture than the LGA case.  Whereas the Court has before it a
request for confirmation of LGA's reorganization plan, FHA has
yet to obtain approval of a disclosure statement. FHA filed its
initial plan and disclosure statement on August 26, 2005.  On
October 5, 2005 FHA filed an amended plan, followed by an amended
disclosure statement on October 18, 2005.  The terms of the FHA
amended plan were similar to those of the LGA plan, in that they
contemplated that the IDA Bonds would retain their tax exempt
status and that the pre-petition delinquencies would be cured on
the effective date.  The FHA disclosure statement and plan were
as vigorously opposed by SunTrust, et. al. as LGA's had been.

At the conclusion of a hearing on FHA's request for approval
of its amended disclosure statement, the Court advised the
parties that it would not rule on the disclosure statement
pending receipt of the advice on the tax issues which were

138

anticipated from Hawkins.  In that respect, the Court explained that it viewed the tax issues to be sufficiently important that resolution of them was worth waiting for prior to proceeding with a confirmation hearing in the FHA case.  The Court's view on that score was premised on two assumptions:  first, that the report from Hawkins was imminent, and secondly, that the report would resolve the open issues.  Neither assumption proved correct.

The Hawkins Report did not arrive until almost 3½ months later, and it did anything but resolve the open issues. SunTrust, nevertheless, felt differently.  Arguing that Hawkins "had spoken," SunTrust maintained that, not only was the LGA plan unconfirmable, but that the FHA plan was too, and that the Court should deny approval of the FHA disclosure statement and terminate the Debtor's exclusivity rights.  Following a hearing on April 18, 2006, the Court issued a ruling on the latter issue.

The Court extended the Debtor's exclusivity period subject to certain conditions: first, the Court noted that while the Hawkins report had not laid the tax questions to rest, the Debtor had always taken the position that ultimately the IRS would vindicate the Debtor's position.  That being the case, there appeared to the Court no reason why FHA could not simply amend its plan and disclosure statement to eliminate the requirement that Hawkins vindicate its position, and replace that with language which assumed that the Debtor's position would

139

ultimately prevail.   Such a revision would not have necessitated
any major overhaul to the FHA plan and disclosure statement,
however, other facts had recently been bought out that
complicated matters.

The evidence as to JFK's recent financial results was very
unfavorable to it, and the Debtor's explanations for its poor
performance were unpersuasive.   Accordingly, as a condition to
the continuation of exclusivity in the FHA case, the Court added
two provisos:   first, a requirement that the Debtor begin making
monthly interest payments on the Bond debt to SunTrust, and
second, that the Debtor file an amended plan and disclosure
statement within forty-five days, which described with greater
specificity exactly where the revenues needed to make effective
date payments, and cover post effective date shortfalls, were
going to come from.

The Debtor commenced, and apparently has continued to make,
the required monthly interest payments.   It also filed a second
amended plan and disclosure statement on June 2, 2006.   The
second amended FHA plan, however, is radically different from
earlier versions.   SunTrust argues that the drastically different
proposal by the Debtor is "dead on arrival."   The Court, for its
part, is constrained to agree that the plan is fatally flawed and
unconfirmable.   Hence, approval of the amended disclosure
statement must be denied.

Among the most notable changes is that the latest version of the FHA plan calls for conversion of the current FHA Bonds into a long term conventional mortgage, with a taxable interest rate equal to the 10 year U.S. Treasury note rate plus 200 basis points.  The note is to be repaid based on a 22 year amortization schedule, with interest only due the first year, and a "balloon" payment of the outstanding balance coming due in seven years. The bonds would be eliminated under this scenario, as, of course, would any issues related to tax exemptions.

Another key feature of the latest FHA plan is the bifurcation of the SunTrust claim into a secured and unsecured component, and the separate classification of SunTrust's unsecured deficiency claim from the claims of general unsecured creditors. The plan proposes to pay the SunTrust deficiency claim in full on the effective date of the plan from cash on hand and the repayment of $1,600,000 claim owed to FHA from an affiliated Field entity.  The SunTrust deficiency claim is therefore characterized in the plan as being unimpaired.  The claims of other general unsecured creditors are accorded the same treatment as in the LGA case and are characterized as impaired.

There are numerous other aspects of the FHA plan which might warrant description and discussion.  As will be seen, however, the problems associated with the foregoing two major changes to the plan render it patently unconfirmable, thus obviating the

141

need to belabor other issues.

### 1.  <u>Bifurcation of the SunTrust Claim</u>

In its amended disclosure statement the Debtor lists the
petition date value of the Holiday Inn as being $46,100,000,
based on a December, 1997 HVS appraisal.

The Debtor concedes, however, that Mr. Lesser, its own
appraiser, values the Holiday Inn as of June 1, 2006, assuming
conventional financing, at $37,000,000.  HVS' "as is" value,
assuming conventional financing, but after a capital expenditure
deduction of approximately $6,000,000, is $24,000,000.  Adding
the capital expenditure deduction back in would produce an HVS
valuation of approximately $30,000,000.  Once again, the CBRE and
HVS appraisals are sharply different.  The reasons, for the most
part, run to the same types of disagreements as in the case of
the Crowne Plaza.  Importantly though, under either assessment
SunTrust is under-secured.

SunTrust asserts a claim of $38,924,173.15 (after a credit
for $1,417,676.94 distributed to it from the "Revenue Account"
established under the Bond documents).  The Debtor scheduled
SunTrust's claim at $39,668,266.  Assuming, arguendo, that the
value of the Holiday Inn is that which Mr. Lesser estimates, and
giving allowance for additional credit against principal for the
monthly payments the Debtor has made since March 2006, it is
clear that SunTrust holds a deficiency claim, which is probably

142

close to $1,500,000.

FHA obviously fears that the inclusion of this claim in the same class as that of FHA's general unsecured trade creditors would turn the anticipated accepting vote by that class into a rejection.[37]  To avoid this consequence, and preserve an impaired accepting class, the Debtor has placed the SunTrust deficiency claim its own class (#15), and proposes to pay the claim in full on the effective date, thus rendering it unimpaired and not entitled to vote on the plan.  It is well established in this circuit, however, that such a tactic is impermissible.

In *John Hancock Mutual Life Ins. Co. vs. Route 37 Business Park Associates,* 987 F.2d 154 (3d Cir. 1993) the Court of Appeals stated that the classification of claims or interests must be reasonable, and quoted the following observation from its earlier decision in *Matter of Jersey City Medical Center* 817 F.2d 1055, 1061 (3d Cir. 1987) with approval:

> [T]here must be some limit on a debtor's
> power to classify creditors in such a manner
> [to assure that at least one class of
> impaired creditors will vote for the plan and
> make it eligible for cram down consideration
> by the court].  The potential for abuse would

---

[37] This fear would appear to be well founded.  The FHA disclosure statement states that as of the petition date the Debtor had $1,535,726 in general unsecured claims.  Acceptance by the class would require the affirmative vote of 50% in number and 66⅔% in amount.  Irrespective of how the former (i.e., the number of claims) issue played out, it is perfectly clear that if SunTrust's deficiency claim is included in the class, the Debtor could never hope to meet the required ⅔ in amount test.

> be significant otherwise.   Unless there is
> some requirement of keeping similar claims
> together, nothing would stand in the way of a
> debtor seeking out a few impaired creditors
> (or even one such creditor) who will vote for
> the plan and placing them in their own class.
>
> *Id.,* quoting *In re U.S. Truck Co., Inc.,*
> 800 F.2d 581, 586 (6th Cir.1986) (footnote
> omitted).

987 F.2d at 158 citing *Matter of Jersey Medical Center*, 817 F.2d

1055, 1061 (3d Cir. 1987).

Thus said the Court in *John Hancock:*

> Where, as in this case, the sole purpose and
> effect of creating multiple classes is to
> mold the outcome of the voting, it follows
> that the classification scheme must provide a
> reasonable method for counting votes.   In a
> "cram down" case, this means that each class
> must represent a voting interest that is
> sufficiently distinct and weighty to merit a
> separate voice in the decision whether the
> proposed reorganization should proceed.
> Otherwise, the classification scheme would
> simply constitute a method for circumventing
> the requirement set out in 11 U.S.C.
> §1129(a)(10) (1988).

987 F.2d at 159.

The attempt of FHA to do in this case precisely that which

the Circuit Court has prohibited is transparent.   This fact alone

makes its plan patently unconfirmable.

### 2.  **Conversion of the LGA Bonds**

SunTrust, as noted, also attacks the adequacy of the

proposed terms of the replacement note and mortgage called for

144

under FHA's amended plan.  It focuses, in particular, on the
interest rate, the elimination of a DSRF, negative amortization
and the risk attendant to the balloon payment feature.  The Court
agrees that these would all be serious impediments to
confirmation of the proposed plan.  However, in the opinion of
the Court, these arguments actually put the cart before the
horse.  The plan, as noted, proposes to take triple tax exempt
bonds, which are fully amortizing, subject to debt reserve
requirements, and freely tradable in the marketplace, and replace
them with debt instruments which bear no relation whatever to
them.  The Court concurs with SunTrust that it is inconceivable
that this plan can satisfy the fair and equitable standard for
cramdown of the plan over objection under §1129(b).  In this
respect as well, the FHA amended plan is patently unconfirmable
on its face.[38]

As a matter of law, it is well established that the Court
should not approve a disclosure statement where the

---

[38] On this score, the Court notes that the Debtor makes no attempt
to reconcile its inconsistent positions on the value of assumable tax
exempt debt.  That is to say that whereas in the LGA case the Debtor
argued that the tax exempt status of the Bonds, and the potential that
such debt could be assumed by a buyer, added millions of dollars of value
to the hotel, in the FHA case, the Debtor proposes to abandon this
hypothesized value, which would (given the Debtor's original position)
significantly  reduce  the  Bondholder's  collateral,  all  without
consideration of the fairness standard of the Code's cramdown provisions.

reorganization plan to which it relates is unconfirmable.[39]  The purpose for this rule of law is to eliminate the wasteful and fruitless exercise of sending the disclosure statement to creditors and soliciting votes on a proposed plan, which cannot be confirmed.  The Court rejects FHA's arguments that the foregoing matters are "confirmation issues."[40]  Rather, for the reasons heretofore expressed, the Court finds the FHA second amended plan to be patently unconfirmable on its face.  Approval of the FHA amended disclosure statement will therefore be denied.

**B. SunTrust's Stay Relief Motion**

SunTrust seeks relief from the automatic stay under 11 U.S.C. §362(d)(1) & (d)(2).  These sections of the Code provide, as follows:

> (d) On request of a party in interest and
> after notice and a hearing, the court shall

---

[39] *In re 266 Washington Assoc.* 141 B.R. 275, 288 (Bankr. E.D.N.Y.), aff'd, 147 B.R. (E.D.N.Y. 1992) (disclosure statement ot approved with "patent legal defects'); *In re Market Square Inn, Inc.,* 163 B.R. 64, 68 (Bankr. W.D. Pa. 1994); see also, *In re Eastern Maine Elec. Co-op, Inc.,* 125 B.R. 329, 333 (Bankr. D. Me. 1991); *In re Hirt* 97 B.R. 981, 98203 (Bankr. E.D. Wis. 1989); *In re Atlanta West VI,* 91 B.R. 620, 622 (Bankr. N.D. Ga. 1988); *In re S.E.T. Income,* 83 B.R. 791, 792 (Bankr. N.D. Okla. 1988); *In re Monroe Well Serv. Inc.* 80 B.R. 324, 333 (Bankr. E.D.Pa. 1987); *In re McCall,* 44 B.R. 242, 243 (Bankr. E.D. Pa. 1984).

[40] On this score, the Court notes that in its post trial brief, FHA argues that it is too soon to determine how FHA intends to classify claims in its plan because it is still considering its options *vis a vis,* classification of a SunTrust deficiency claim.  This argument fails, as the Debtor has clearly selected the "option" it prefers and placed SunTrust's deficiency claim in a voting class by itself.  Evaluation of that choice is anything but premature at this point.

> grant relief from the stay provided under
> subsection (a) of this section, such as by
> terminating, annulling, modifying, or
> conditioning such stay--
>
> (1) for cause, including the lack of adequate
> protection of an interest in property of such
> party in interest;
>
> (2) with respect to a stay of an act against
> property under subsection (a) of this
> section, if--
>
> (A) the debtor does not have an equity in
> such property;   and
>
> (B) such property is not necessary to an
> effective reorganization;

The issue as to stay relief herein is more straightforward where §362 (d)(2) is concerned.  As discussed above, the Debtor's lack of equity in the Holiday Inn (the only issue on which SunTrust bears the burden of proof) has been established. §362(d)(2), however, is framed in the conjunctive, which is to say that if the Debtor lacks equity, the Debtor must demonstrate that the property is necessary for an effective reorganization of its affairs in order to successfully resist a relief from stay motion.  The Debtor argues, on this score, that as the Holiday Inn is its principal asset, it cannot reorganize without it. Interpretative case law teaches, however, that more than this simplistic and self-evident assertion is required.

As construed by the Supreme Court in *United Savings Association v. Timbers of Inwood Forest Associates Limited,* 484

147

U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988), an "effective reorganization" requires "a reasonable possibility of a successful reorganization within a reasonable time." *Timbers,* 484 U.S. at 375-376, 108 S.Ct. at 633. Or, as alternatively put by the Third Circuit in *John Hancock, supra,* the "effective reorganization" requirement enunciated by the Supreme Court in *Timbers* requires a showing by the Debtor that a proposed or contemplated plan is not patently unconfirmable and has a realistic chance of being confirmed. 987 F.2d at 157 *quoting* 266 *Washington Assoc.*, 141 B.R. at 281. The corollary to this, as noted later by the Third Circuit Court of Appeals in *In re Swedeland Development Group Inc.* 16 F.3d 552 (3d Cir.1994) *en banc,* is that the failure of the Debtor to demonstrate that an effective reorganization is in prospect mandates modification of the Bankruptcy stay. 16 F.3d at 568.

Measured against the above, it is clear that SunTrust is entitled to stay relief. The FHA case has been pending for almost two years. The Court acknowledges FHA's argument that some part of the delay was due to the Court having not acted on its original disclosure statement following the hearing held on October 20, 2005. The fact of the matter, however, is that rather than harming FHA, the delay probably helped it. The financial performance of FHA in 2005 was poor and fell significantly short of its projections. The passage of time has

148

enabled FHA to improve somewhat.  The problem for FHA is that its performance has not improved nearly enough.  CBRE estimated that the value of the Crowne Plaza increased over $5,000,000 between June 1, 2005 and June 1, 2006.  Conversely the value of the Holiday Inn according to CBRE remained $37,000,000 on both dates.

With the property having stagnated, in a rising market, the Debtor has scrapped the entire construct of its original plan, and proposed a plan, which on its face reflects two insuperable barriers to confirmation.  On these facts, the Court agrees that FHA has failed to demonstrate "the reasonable possibility of a successful reorganization within a reasonable time."  The Debtor's exclusivity period will therefore be terminated and the SunTrust stay relief motion will be granted.

The above conclusion obviates the need for the Court to dwell on SunTrust's request for relief from the bankruptcy stay as predicated on §362(d)(1).

An appropriate Order follows.

By the Court:


Stephen Raslavich
United States Bankruptcy Judge

Dated:    September 13, 2006


149

**In the United States Bankruptcy Court**
**For the Eastern District of Pennsylvania**

| | |
|---|---|
| In re: | : Chapter 11 |
| | : |
| La Guardia Associates, L.P. and | : (JOINTLY ADMINISTERED) |
| Field Hotel Associates, L.P. | : Bankruptcy No. 04-34512 SR |
| Debtor(s) | : Bankruptcy No. 04-34514 SR |

# <u>Order</u>

     **And now**, upon consideration of 1) the Motion of Debtor, La
Guardia Associates, L.P. (hereinafter "LGA"); to Approve
Confirmation of its Third Amended Plan of Reorganization; 2) the
Motion of Debtor, Field Hotel Associates L.P. (hereinafter "FHA")
to approve its Amended Disclosure Statement; 3) the Motion of
SunTrust for relief from the automatic stay under 11 U.S.C. §362
in each bankruptcy case; and 4) the Motions of SunTrust, Brickman
Airport Transportation and the United States Trustee for an
Order: A) declaring certain parties insiders of LGA;
B)designating their accepting votes in the LGA case as lacking
good faith under 11 U.S.C. §1126(e); C) directing that their
votes not be counted for plan voting purposes; and D) equitably
subordinating their claims to the claims of all non-insider
creditors of LGA (hereinafter the "Designation Motion"), all
answers and memorandum filed in response thereto, and after
multiple hearings held, it is hereby:

     **Ordered,** that for the reasons set forth in the accompanying
Opinion, 1)the LGA Motion to Approve Confirmation of the Plan in

its present form, shall be and hereby is Denied, however LGA

shall have two weeks from today to amend its plan in conformity

with the provisions of the Court's Opinion.  A follow-up hearing

to determine whether the LGA Plan, if so amended, shall be

confirmed, shall be held on October 5, 2006, at 10:00 a.m.,

United States Bankruptcy Court, 900 Market Street, 2nd Floor,

Courtroom No. 4,  Philadelphia, Pennsylvania, 19107.  Pending the

conclusion of said follow-up hearing, the Debtor's exclusivity

rights shall remain in place and the SunTrust Motion for Relief

as to LGA shall be Denied, without prejudice; and it is further:

**Ordered**, that the Designation Motion is Denied in its

entirety, and it is further:

**Ordered**, that the FHA request for approval of its Second

Amended Disclosure Statement is denied.  Exclusivity rights in

the FHA case are terminated, and the SunTrust Motion for Relief

from the Automatic Stay in the FHA case is Granted.


By the Court:


_____
Stephen Raslavich
Dated:  September 13, 2006        United States Bankruptcy Judge


2

**Interested Parties:**

Lawrence J. Brenner, Esquire
Office of the Corporate Counsel
100 Church Street
New York, NY 10007

Myron A. Bloom, Esquire
Hangley Aronchick Segal & Pudlin
One Logan Square
27th Floor
Philadelphia PA 19103

Ashely M. Chan, Esquire
Hangley Aronchick Segal & Pudlin
One Logan Square
27th Floor
Philadelphia, PA 19103

Sharon Chau, Esquire
National Labor Relations Borad
One Metrotech Center North
10th Floor
Brooklyn, NY 11201

Regina Cohen, Esquire
Lavin O'Neil Ricci Cedrone & Disipi
190 North Independence Mall West
6th & Race Streets
Suite 500
Philadelphia, PA 19106

Magdeline D. Coleman, Esquire
Buchanan Ingersoll Professional Corp.
Eleven Penn Center Plaza
1835 Market Street
14th Floor
Philadelphia, PA 19103

Edward J. DiDonato, Esquire
Fox Rothschild, LLP
2000 Market Street
11th Floor
Philadelphia PA 19103

George Conway, Esquire
Office Of The U.S. Trustee
833 Chestnut Street
Suite 500
Philadelphia PA  19106

Robert B. Eyre, Esquire
Buchanan Ingersoll P.C.
Eleven Penn Center, 14th Floor
1835 Market Street
Philadelphia, Pa 19103

Garry M. Graber. Esquire
Hodgson Russ Llp
One M & T Plaza
Ste 2000
Buffalo, Ny 14203

Andrew Hoffmann, Esquire
Wiseman & Hoffmann
460 Park Avenue South
4th Floor
New York, Ny 10016

Robert A. Kargen, Esquire
White and Williams Llp
1800 One Liberty Place
Philadelphia, Pa 19103

Christopher J. Kern, Esquire
Lavin O'neil Ricci Cedrone & Disipi
190 North Independence Mall West
6th and Race Streets
Suite 500
Philadelphia, Pa 19106

Tracy L. Klestadt, Esquire
Klestadt & Winters, Llp
292 Madison Avenue, 17th Floor
New York, Ny 10017

William J. Levant, Esquire
Kaplin Stewart
910 Harvest Drive
Post Office Box 3037
Blue Bell, Pa 19422

4

Mark S. Lichtenstein, Esquire
Buchanan Ingersoll PC
One Chase Manhattan Centre
35th Fl.
New York, Ny 10005-1417

Jeremy E. Meyer, Esquire
1420 Walnut Street
Suite 300
Philadelphia, Pa 19102

Jami B. Nimeroff, Esquire
Buchanan Ingersoll
Eleven Penn Center, 14th Floor
1835 Market Street
Philadelphia, Pa 19103

Robert E. Price, Esquire
2019 Walnut Street
Philadelphia, Pa 19103

Peter Russ, Esquire
Buchanan Ingersoll
1835 Market Street
Philadelphia, Pa 19103

Barry N. Saltzman, Esquire
Pryor Cashman Sherman & Flynn LLP
410 Park Ave
New York, Ny 10022

Axel A. Shield, II, Esquire
Gelt Financial
1265 Industrial Blvd
South Hamptom, Pa 18966

Margaret P. Steere, Esquire
Hangley Aronchick Segal & Pudlin
One Logan Square
27th Floor
Philadelphia, Pa 19103

Amy Vulpio, Esquire
White & Williams
1800 One Liberty Place
Philadelphia Pa 19102

5

Lawrence G. McMichael, Esquire
Dilworth Paxson, LLP
3200 Mellon Bank Center
1735 Market Street
Philadelphia Pa 19103

Martin J. Weis, Esquire
Dilworth Paxon LLP
1735 Market Street
Philadelphia, Pa 19103

Jennifer L. Maleski, Esquire
Dilworth Paxson LLP
1735 Market Street
3200 Mellon Bank Center
Philadelphia, Pa 19103

David W. Debruin, Esquire
Bifferato, Gentilotti & Biden, P.A.
1308 Delaware Avenue
P.O. Box 2165
Wilmington, De 19806